## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KEN E. WILLIAMS | )<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. ____ |
| v. | )<br>)<br>)<br>) |
| CITY OF BROCKTON, CITY OF BROCKTON POLICE DEPARTMENT, AND DOES 1-100, UNNAMED CO-CONSPIRATORS | )<br>) **FILED UNDER SEAL**<br>)<br>) |
| Defendants. | )<br>)<br>) **JURY TRIAL DEMANDED**<br>) |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 *ET SEQ.*

Paul Lynch
The Law Office of Paul Lynch
185 Devonshire Street
Suite 301
Boston, Massachusetts 02110
Telephone: 617-426-1120
Facsimile: 617-348-2147

Thomas J. Poulin
Kierstan L. Carlson
Blank Rome LLP
Watergate Office Building
600 New Hampshire Ave., NW
Washington, DC 20037
Telephone: 202-772-5986
Facsimile: 202-572-8432

*Counsel for Plaintiff/Relator*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................................................1

II.     JURISDICTION AND VENUE ....................................................................................4

III.    PARTIES .......................................................................................................................4

        A.      Relator Ken E. Williams...................................................................................4

        B.      Defendant City of Brockton...............................................................................5

        C.      Defendant City of Brockton Police Department.................................................6

        D.      Defendant Does 1-100 .......................................................................................6

IV.     THE CITY AND THE BPD MANIPULATE THE COPS PROGRAM...........................7

        A.      Overview of the COPS Program........................................................................8

        B.      Applications for COPS Grants and Required Certifications of Compliance
                with Federal Civil Rights Laws. .....................................................................10

V.      DEFENDANTS' PATTERN AND PRACTICE OF UNLAWFUL
        DISCRIMINATION AND THE CULTURE OF BIAS ..................................................15

        A.      Relator Williams Helps Initiate the *Semedo* Civil Rights Case ......................18

        B.      *Semedo v. Elliot* .............................................................................................28

        C.      *Ceneus v. Kalp* ..............................................................................................28

        D.      *Summers v. City of Brockton*..........................................................................29

        E.      *Medina v. Coady* ...........................................................................................29

        F.      *Zhuang v. Saquet*...........................................................................................30

        G.      *Non-Public Cases and False Reporting*...........................................................30

        H.      Defendants' Pattern and Practice of "Protecting the Institution" ......................31

VI.     DEFENDANTS DEFRAUDED GOVERNMENT PROGRAMS BY SUBMISSION
        OF FALSE CLAIMS ...................................................................................................36

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. §
3729(a)(1)(A)).....................................................................................................................41

COUNT II FALSE RECORDS OR STATEMENTS  (Violation of False Claims Act, 31
U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)). ...............................................................42

COUNT III  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C.
§ 3729(a)(1)(C)).................................................................................................................42

COUNT IV UNLAWFUL RETALIATION  (Violation of False Claims Act, 31 U.S.C.
§ 3730(h)).............................................................................................................................43

139505.00601/36227648v.3

## I.   INTRODUCTION

*At the foundation of our civil liberties lies the principle that denies to government officials an exceptional position before the law and which subjects them to the same rules of conduct that are commands to the citizen.*
*-- Justice Louis D. Brandeis*

1.     Law enforcement officers have the right to exercise certain powers when they deal with citizens and suspects, but these powers must be exercised responsibly.  Indeed, Federal criminal and civil rights laws prohibit law enforcement agents from conspiring to interfere with federally protected rights, depriving rights under color of law, or using or conspiring to use force, or threat of force, to interfere with the free exercise of civil rights.

2.     As described in this Complaint, the City of Brockton (the "City" or "Brockton") and the Brockton Police Department (the "BPD") have not exercised these powers responsibly.  Instead, the City and the BPD have engaged in, and continue to engage in, a pattern and practice of unlawful discriminatory police conduct directed at African-Americans, Hispanics, Cape Verdeans, and other minorities in the City of Brockton.

3.     Minorities in the City have been frequently stopped, detained, searched, falsely arrested, assaulted, subjected to excessive force and disparate treatment, and denied due process and other constitutional protections because of their race, color, or national origin.  As a result of this pattern and practice of unlawful discrimination, minorities in the City have been systematically denied their constitutional rights; the relationship between the BPD and key segments of the community has been eroded, making it more difficult for the police to fight crime; and the safety of innocent citizens and prisoners has been jeopardized.

4.     Constitutional policing is an essential element of effective law enforcement.  The City and BPD's conduct as alleged in this Complaint has not been constitutional, nor has it constituted effective law enforcement.  Brockton, which is responsible for funding and oversight

1

of the BPD, has knowingly failed to ensure to its citizens that BPD's programs or activities comply with the requirements of the U.S. Constitution and Federal law. Defendants' violations of the Constitution and laws of the United States are the foreseeable consequence of the pervasive disregard that the City and BPD have for minorities.

5.      BPD police officers and supervisors have disparaged minorities by referring to these citizens as "monkey," "nigger," "goat herder," "fucking Haitian," "rag heads," "boy," "natives," "savages," and "you people." Minorities have been subjected to disparaging name calling and racially charged language that was considered perfectly acceptable behavior by senior-level City and police administrative managers. BPD supervisors have expressed anti-minority bias in words and actions that set the tone and create a culture of bias that contributes to unlawful actions and deprivations of rights guaranteed under the Constitution. The BPD has promoted, and has been knowingly indifferent to, the discriminatory conduct of its law enforcement officers, as is demonstrated by inadequate policies, ineffective training, non-existent accountability measures, poor supervision, improper oversight, questionable data collection mechanisms, distorted enforcement prioritization, an ineffective complaint and disciplinary system, and dramatic departures from standard law enforcement practices.

6.      This action is brought on behalf of the United States by Ken E. Williams, a decorated former Brockton Police Department Patrolman and Detective, ("Relator Williams"), by and through his counsel, against the City of Brockton, Massachusetts (the "City"), the City of Brockton, Massachusetts Police Department (the "BPD"), and Does 1-100, unnamed co-conspirators (collectively "Defendants") pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA").

7.      Relator Williams seeks to recover damages and civil penalties on behalf of the United States (the "United States" or the "Government") arising from false statements and claims made and caused to be made by Defendants, and their agents and employees, in violation of the FCA.  Relator Williams also seeks through this action all remedies afforded under the FCA, including declaratory and injunctive relief to rectify the Defendants' violations of law, and to ensure that the BPD implements sustainable reforms establishing Constitutional police practices, which will enhance public safety for all citizens in the City, and ensure the people's constitutional rights are not violated.

8.      The false statements and claims described herein, which flow from Defendants' violations of civil rights, are based on Defendants' fraudulent and false certifications of compliance with Federal civil rights laws in applications for Federal grants, including those applications and grants related to the United States Department of Justice's Community Oriented Policing Services program ("COPS").

9.      From at least 1994 through the present, in order to improperly obtain millions of dollars in Federal funds, Defendants represented and certified to the Federal COPS program their compliance with non-discriminatory law enforcement practices.  In truth, Defendants were engaging in a pattern and practice of unlawful discrimination and civil rights violations on the basis of, *inter alia*, race, color, or national origin, and thus were not entitled to Federal grants.

10.      Defendants also unlawfully retaliated against Relator Williams after he complained to BPD managers, including BPD Chief Gomes, about BPD's civil rights violations; counseled an illegally jailed citizen of Cape Verdean descent, Jose Semedo, to file a complaint against the BPD officers who violated Mr. Semedo's civil rights; and testified truthfully concerning unethical behavior of a long-time BPD sergeant.  Defendants' retaliation against

3

Relator Williams, as described more fully below, violated the anti-retaliation provision of the FCA.

## II. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

12. This Court has personal jurisdiction over Defendants because, among other things, Defendants are located in this District, and engaged in wrongdoing in this District.

13. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c), and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

14. The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## III. PARTIES

### A. RELATOR KEN E. WILLIAMS

15. Relator Ken E. Williams is a resident of Lakeville, Massachusetts, and is currently employed as a Crime Lab Technician and Questioned Documents Examiner at the Plymouth County Sheriff's Department. Relator Williams was a decorated officer of the Brockton Police Department, employed there from October 30, 1995 until November 12, 2010, when he was unlawfully terminated as a result of his lawful whistle-blowing activities. From October 1995 through October 1997, Relator Williams served the BPD as a patrolman. His primary tasks were to enforce local and state laws. In October 1997, Relator Williams was promoted to Generalist Detective, a position he held until November 2010. In this role, Relator Williams was responsible for specialized duties such as interviews and interrogations, forensic

4

computer examinations, and other community-oriented assignments under the supervision of the
Chief of the BPD or the Commanding Officer for the Criminal Investigations Division.

16.     In 2009, the Massachusetts State Police honored Relator Williams with the
State Police Superintendent's Commendation, which is established to bestow recognition upon
any person who has made an exceptional contribution to the Massachusetts State Police and for
contributions to public safety, acts of bravery, and police work beyond the normal call of duty.

17.     Relator Williams holds a bachelor's degree from Western New England
College. He also served in the United States Army, within the Army Signal Corps, from
1989 until 1991, when he received an Honorable Discharge.

18.     Relator Williams was among the first round of police recruits to be hired
under the COPS grant program. In October 1995, Relator Williams was selected by the BPD as
a recruit after he passed a competitive Massachusetts Civil Service entry-level police exam. The
Office of Community Oriented Policing Services ("COPS") was created in 1994 to distribute and
monitor the Federal grants issued under that program. COPS grants assist cities and towns in
hiring thousands of entry-level police recruit positions throughout the United States.

19.     Relator Williams is the original source of the allegations in this Complaint.
The essential elements of his allegations are not based upon publicly disclosed information.
Relator Williams voluntarily provided the Government with the information supporting his
claims prior to the filing of this Complaint. Accordingly, Relator Williams is an "original
source" of the information alleged in this Complaint within the meaning of 31 U.S.C.
§ 3730(e)(4)(A) and (B).

## B.     DEFENDANT CITY OF BROCKTON

20.     The City of Brockton is a public municipality as defined by the laws of the
Commonwealth of Massachusetts.     Its principal address is 45 School Street, Brockton,

5

Massachusetts 02301. The City is located in Plymouth County, 20 miles southwest of Boston. The City has a population of approximately 93,810 (2010 Federal census) and occupies a land area of 21.4 square miles. Brockton is the population center of a primary metropolitan statistical area of approximately 170,000 persons. The City's government is by an elected mayor and 11-member city council.

21.     The City provides general governmental services and oversight for the territory within its boundaries, including police protection.

22.     The assets of the City exceeded its liabilities at the close of fiscal year 2011 by approximately $208.7 million (net assets).

## C.     DEFENDANT CITY OF BROCKTON POLICE DEPARTMENT

23.     The Defendant Brockton Police Department has a principal address of 7 Commercial Street, Brockton, Massachusetts 02302.

24.     The current chief of police of the BPD is Emanuel Gomes. Police Chief Gomes began his term in February 2012. Chief Gomes' predecessor was Chief William Conlon, who succeeded former Chief Paul Studenski.

25.     The BPD has approximately 168 officers who serve in a variety of capacities, including within the Department's Detective Division, Detail Office, Computer Management Division, and Administration Bureau, and as traffic police and Internal Affairs officers. The BPD is a public entity which discharges the law enforcement responsibilities of the City. The BPD has historically been dominated by non-minority police officers.

## D.     DEFENDANT DOES 1-100

26.     Defendant Does 1-100 are individuals or entities who are known or unknown actors who aided and abetted the violation of civil rights and submission of the false claims described herein. To the extent that any of the conduct or activities described in this Complaint

6

were not wholly or in part performed by Defendants, but by the individuals or entities described herein as Does 1-100, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to Does 1-100. As a result of actions of Does 1-100, the United States has suffered financial harm.

## IV. THE CITY AND THE BPD MANIPULATE THE COPS PROGRAM

27. COPS is an agency within the Department of Justice, and was created by the Violent Crime Control and Law Enforcement Act of 1994, the largest crime bill in U.S. history. Congress created the COPS program to promote a community-based approach to law enforcement, which encourages preventing crime rather than responding once crime has been committed. The purpose of the COPS program is to improve public safety by addressing both the roots of crime and the culture of fear created by crime, a culture which perpetuates criminal activity. To effectuate this purpose, COPS provides grants that allow community policing officers to work within their own communities, and to develop relationships and build trust with community members. At its core, community policing is a philosophy that promotes public safety through various problem solving techniques, and the use of partnerships between law enforcement and community-based organizations, including increased foot patrols by police officers to augment police presence in local communities.

28. The BPD publicly represents, including through its website and public statements, that its mission is to "promote, wherever possible, the philosophy of Community Policing; which fosters a working relationship between the police department, community residents, business owners, and all affected parties in the City of Brockton to resolve law enforcement issues." The BPD further represents that it is "committed to providing the highest quality of police services by empowering our members and the community to work in

7

partnership with the goal of improving the quality of life within the City of Brockton, while at

the same time maintaining respect for individual rights and dignity."

29.    The BPD further publicly acknowledges that:

[T]he city of Brockton encompasses a variety of individuals, each with his or her
own distinctive cultural values, lifestyles, customs and problems. The nature of
the city is further manifested by the diverse ethnic and sociological background of
its people. However, all persons in the city share the common need for protection
and service through objective and impartial law enforcement. The recognition of
individual dignity is vital in a free society. Since all persons are subject to the law,
all persons have a right to dignified treatment under the law. The protection of
this right is a fundamental responsibility of the Department and its members.
Every Department member is responsible for treating each person with respect,
mindful that the person possesses human emotions and needs. The daily contact
with members of the community presents a unique opportunity to strengthen
police community relations. In all contacts with the public, members must inspire
respect for themselves as individuals, and as representatives of the Department,
by respecting the human rights of all members of the community.

30.    As described in this Complaint, the BPD's public statements are false. The

truth is that the City and the BPD have condoned, fostered, and concealed a pattern and practice

of discrimination, which is in direct contradiction of their publically stated goal of "respecting

the human rights of all members of the community."

## A.    OVERVIEW OF THE COPS PROGRAM

31.    Racially neutral and non-discriminatory policing policies are a central tenet of

the COPS program. Such policies are crucial to community policing and have been a core value

of the COPS program since its inception.

32.    The COPS program provides ample guidance for police departments on how

to address problematic racially-biased and other discriminatory practices and how to involve

local community members to develop policing techniques tailored to individual communities.

33.    The COPS program is administered by the United States Department of

Justice ("DOJ"). COPS grants are Federal funds from the U.S. Treasury and, since 2009, are

8

funded at least in part through the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (codified in scattered sections of the U.S. Code) ("ARRA").

34.     The COPS program awards grants to state, local, and tribal law enforcement agencies throughout the United States that permit the agencies to hire and train law enforcement officers to participate in community policing, to purchase and deploy new crime fighting technologies, and to develop and test new and innovative policing strategies that integrate police officers into the community at large.

35.     Currently, COPS grants are awarded in conjunction with five distinct components of the COPS program, including: the Community Policing Development Program, the COPS Hiring Program, the Coordinated Tribal Assistance Solicitation, the Secure Our Schools Program, and the Child Sexual Predator Program. For example, grants awarded through the COPS Hiring Recovery Program should be used to provide one hundred percent of the approved salary and benefits for entry-level officer positions over a three year period, or for rehired officers who have been laid off or officers scheduled to be laid off at a future date because of local budget cuts. Similarly, grants awarded under the Secure Our Schools Program should be used to increase police presence in high risk schools and encourage cooperation between schools and local police departments. Previous grants also focused on updating the technological capabilities of local police forces.

36.     Since the inception of COPS, Congress has allocated approximately $15 billion for administering the program and awarding Federal grants. The COPS program has provided funding to more than 13,000 law enforcement agencies, and been responsible for the addition of over 100,000 community policing officers nationwide.

9

37.     Applicants for, and recipients of, COPS grants like the City and BPD are required by law to comply with Federal civil rights laws and to certify compliance with the program's nondiscrimination requirements as a condition of receiving grants. The failure to adhere to COPS program requirements can result in suspension or termination of funding, and/or the imposition of sanctions on the noncompliant grantee.

## B.     APPLICATIONS FOR COPS GRANTS AND REQUIRED CERTIFICATIONS OF COMPLIANCE WITH FEDERAL CIVIL RIGHTS LAWS

38.     Applicants for funding under the COPS programs must register via www.grants.gov, complete an application form, Form SF-424, and provide attachments outlining certain required information, including but not limited to the applicants' community policing strategies, need for Federal assistance, and annual budgets. Some of the required attachments are program specific, such as the school safety assessment for applicants under the Secure Our Schools program.

39.     The COPS Application Guide, which instructs applicants on the materials that must be submitted with an application for a COPS grant, explicitly cautions applicants that "[u]nder the False Claims Act, any credible evidence that a person has submitted a false claim or has committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving COPS funds may be referred to the Office of Inspector General."

40.     Applicants, such as the City and the BPD, are further cautioned in numerous COPS application guidances and materials that false statements or claims in connection with COPS grants may result in fines, imprisonment, or debarment from participating in Federal grants or contracts, and/or any other remedy available by law.

10

41.     Applicants and recipients must thus ensure that all documentation related to the receipt and use of award funding, including applications, progress reports, and Federal financial reports, is true and accurate.

42.     In addition, all COPS grant applicants must sign a standardized "Assurances" form as a precondition for receiving COPS grants. The Assurances form must be executed by both a law enforcement executive and a government executive or financial official.

43.     The government executives and law enforcement officials applying for COPS grants must "certify that the assurances provided are true and accurate to the best of [their] knowledge." These certifications must be truthful, and are express conditions of the Government's decision to award any grants.

44.     Signatures on the Assurances form are treated as *material representations of fact* upon which the DOJ relies in determining whether to award a COPS grant. Grantee entities are cautioned that "[e]lections or other selections of new officials will not relieve the grantee entity of its obligations under [the COPS] grant."

45.     The Assurances form expressly provides that: "By the applicant's authorized representative's signature, the applicant assures that it will comply with all legal and administrative requirements that govern the applicant for acceptance and use of Federal grant funds."

46.     Among the requirements with which applicants assure their compliance is that the applicants "will comply with all requirements imposed by the [DOJ] as a condition or administrative requirement of the grant, including but not limited to: . . . applicable provisions of the Omnibus Crime Control and Safe Streets Act of 1968, as amended; . . . the applicable COPS Application Guidelines; [and] the applicable COPS Grant Owner's Manuals."

11

47.     Importantly, the Assurances form contains civil rights requirements—both as a prerequisite for obtaining COPS grants and as an ongoing duty with which grantees must comply. Applicants and grantees must expressly assure that they "will not, on the ground of race, color, religion, national origin, gender, disability or age, unlawfully exclude any person from participation in, deny the benefits of or employment to any person, or subject any person to discrimination in connection with any programs or activities funded in whole or in part with Federal funds." The Assurances form notes that "[t]hese civil rights requirements are found in the non-discrimination provision of the Omnibus Crime Control and Safe Streets Act of 1968, as amended (42 U.S.C. § 3789d); Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000d); the Indian Civil Rights Act (25 U.S.C. §§ 1301-1303); Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794); Title II, Subtitle A of the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101, et seq.); the Age Discrimination Act of 1975 (42 U.S.C. § 6101, et seq.); and Department of Justice Non-Discrimination Regulations contained in Title 28, Parts 35 and 42 (subparts C, D, E, G, and I) of the Code of Federal Regulations."

48.     The regulations implementing Title VI explicitly prohibit practices that result in a disparate impact based on race, color, or national origin. In administering a program or activity, a funding recipient such as the City or BPD may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." 28 C.F.R. § 42.104(b)(2).

49.     If an applicant or grantee seeks or receives an award of $500,000 or more and has 50 or more employees, the applicant or grantee must prepare an Equal Employment Opportunity Plan ("EEOP") and submit it to the DOJ's Office of Justice Programs, Office for

12

Civil Rights ("OCR"). If the applicant or grantee seeks or receives an award between $25,000 and $500,000 and has 50 or more employees, it must still prepare an EEOP, but need not submit it to OCR.

50.     The Assurances form also imposes upon applicants and grantees an ongoing obligation to notify the Office for Civil Rights, Office of Justice if any court or administrative agency determines that the applicant engaged in unlawful discrimination. The DOJ may place a hold on an application if it determines that the applicant is noncompliant with Federal civil rights laws or is not cooperating with an ongoing Federal civil rights investigation.

51.     In addition to the Assurances form, COPS grant applicants and grantees must also sign a Certifications form. Here, both a law enforcement executive and government executive or financial official must certify to the DOJ that they are compliant with, among other things, the coordination requirements of the Public Safety Partnership and Community Policing Act of 1994. Just as on the Assurances form, Certifications are treated as *material representations of fact* upon which reliance will be placed when the DOJ determines to award the covered grant.

52.     The COPS Program Award Owner's Manual, which is distributed to grantees upon award of COPS funds, reminds grantees of their obligations under the COPS program, including with respect to unlawful discrimination, and cautions recipients of COPS grants that false statements or claims in connection with COPS grants are impermissible.

53.     COPS grant recipients also receive a memorandum from DOJ's OCR. This memorandum informs grant recipients that OCR is responsible for ensuring that they comply with Federal civil rights statutes and regulations, and other conditions of COPS grants, such as

providing services to limited English proficiency individuals and meeting the EEOP reporting requirement.

54.    Indeed, in recognizing the importance of recipients complying with the conditions for awarding and properly using COPS grants, available program remedies include: temporarily withholding payments, disallowing all or part of the cost of the activity or action not in compliance, wholly or partly suspending or terminating grants, requiring that some or all of the grant funds be remitted to DOJ, conditioning a future grant or electing not to provide future grant funds until appropriate actions are taken to ensure compliance; barring future awards, and/or recommending civil or criminal enforcement.   Because COPS grants are now distributed under ARRA, grant applicants and grantees must also comply with civil rights requirements and several transparency and accountability requirements for ARRA grants.

55.    With regard to civil rights, the Office of the Attorney General has issued written guidance on the linkage between receipt of ARRA funding and non-discrimination.  For example, a September 27, 2010 memorandum to the Heads of all Executive Departments and Agencies providing financial assistance under ARRA reminded them of their "obligation to enforce statutes that prohibit discrimination in programs or activities that receive [ARRA] funds." One such obligation is that any institution that participates in an ARRA-funded project shall promptly refer to an appropriate inspector general any credible evidence that a principal, employee, agent, contractor, sub-grantee, subcontractor, or other person has submitted a false claim under the False Claims Act or has committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving those funds.

14

56.     At all times material to the allegations in this Complaint, Defendants' receipt of COPS grants was based on knowingly false certifications of compliance with the various non-discrimination provisions of the COPS grant requirements, and ignored ARRA required reporting. Had the United States known that Defendants were falsely certifying compliance or failing to uphold their ARRA reporting obligations, the Government would not have awarded to Defendants millions of dollars in COPS grant funding.

## V.     DEFENDANTS' PATTERN AND PRACTICE OF UNLAWFUL DISCRIMINATION AND THE CULTURE OF BIAS

57.     At all times material to the allegations in this Complaint, Defendants, the City of Brockton, as well as by and through the BPD, have engaged in an ongoing pattern and practice of unlawful discrimination and have successfully concealed their civil rights violations from the public, as well as from the United States.

58.     During his long tenure with the BPD, Relator Williams witnessed numerous civil rights violations and Defendants' culture of bias.

59.     When he was hired, Relator Williams was informed that the BPD had a policy against discrimination and harassment, which as Relator Williams soon discovered, was merely a false representation to its employees, the public and the United States. The BPD's "Statement of Equal Opportunity" expressly prohibited "discriminations or harassment based on race, color, national origin, sex, religion, age, veteran's status, marital status, non-disqualifying physical or mental handicap, and political affiliation." According to the Statement, BPD's policy "is applied in all phases of police department operations" and violations of the policy are prohibited by law.

60.     Despite the BPD's policy, Relator Williams became witness to the City's and BPD's pervasive culture of disregard for the rights of minorities. As alleged above, BPD police officers and supervisors, as well as City officials, frequently disparaged minorities by referring to

15

these citizens as "monkey," "nigger," "goat herder," "fucking Haitian," "rag heads," "boy," "natives," "savages," and "you people." Minorities were subject to disparaging name calling and racially charged language that was considered perfectly acceptable behavior by senior-level City and BPD administrative managers.

61. Approximately six months after Relator Williams began his employment with the BPD, in or around May 1996, he experienced first-hand the BPD's culture of bias and discriminatory treatment as carried out by the BPD shift commander, Robert DiCarli. Relator Williams and Officer Callie Royster, both African-American police officers, submitted a written request to DiCarli for Relator Williams and Officer Royster to become patrol car partners. The request was denied because BPD protocol permitted white officers to partner with white, black, Hispanic, and Cape Verdean officers, so long as a written request was submitted to the shift commander, but prohibited minority officers from partnering with other minority officers, even if such a request was submitted.

62. The denial of Relator Williams' request came as a shock to both Relator Williams and Officer Royster, particularly because neither officer had a history of inappropriate conduct, nor had either officer been disciplined or received any type of corrective action for non-disciplinary reasons. They learned that Shift Commander DiCarli did not reject the officers' request due to corrective action or disciplinary reasons; instead, he verbally told Relator Williams and Officer Royster that City residents were not prepared to see two African-American police officers with guns responding to their home for an emergency call. According to DiCarli, partnering two black police officers would lead to a flood of citizen complaints and he wanted to avoid such a "hassle." Both Relator Williams and Officer Royster were upset with the decision

16

and the underlying reasoning for the denial, but neither wanted to "make waves" by reporting the discriminatory treatment.

63. From this time forward, Relator Williams experienced and witnessed the racial and ethnic bias that pervaded the City and the BPD in its mistreatment of minorities, and the regular, ongoing violation of civil rights.

64. In further illustration of the BPD's callous racial bias, BPD training has included a screening of the racially-charged beating of Rodney King. The BPD firearms, weapons, and "use of force," instructor, Sergeant Linehan, has required police officers to watch the video of the infamous beating of Rodney King by officers of the Los Angeles Police Department ("LAPD") during biannual training sessions. As part of the training, Sergeant Linehan has told trainees that BPD's policy for using a baton is better and more efficient than the LAPD's policy because it calls for officers to strike with great force in certain body areas with the goal of breaking a suspect's bones, and rendering him or her disabled, whereas the LAPD was simply using multiple blows to disable suspects.

65. For Relator Williams, the Defendants' blatant disregard for civil rights reached a boiling point in the *Semedo* case, which Relator Williams was instrumental in initiating. *Semedo* involved the false arrest of a Brockton citizen of Cape Verdean descent, which was followed by attempts by the BPD to minimize the racist conduct, but after evidentiary hearings at which Relator Williams testified, resulted in factual findings of discrimination. And notably, the Hearing Officer found that one of the officers involved was known by the BPD to have engaged in racist conduct since at least 1988, yet continued to be employed (and promoted) by the BPD.

17

66.    During Relator Williams' tenure at the BPD, multiple lawsuits and complaints have been filed against the City, the BPD, or BPD officers, alleging civil rights violations by BPD officers. In one of these suits, the plaintiff alleged, and the City and BPD did not dispute, that over 200 complaints were filed against BPD officers between 1996 and 2009, many of which related to harassment, misconduct, and discrimination on the basis of race or national origin. *See Semedo v. Elliot*, No. 10–11976, 2012 U.S. Dist. LEXIS 89329, at *6 n3 (D. Mass. June 28, 2012); *see also id.* at *6 n.5 (describing a handwritten list of complaints lodged with BPD's Internal Affairs Department alleging racially discriminatory conduct by BPD officers and listing the number of complaints by year: 31 in 1996, 21 in 1997, 19 in 1998, 15 in 1999, 22 in 2000, 5 in 2001, 16 in 2002, 12 in 2003 and 2004, 11 in 2005 and 2006, 4 in 2007, 7 in 2008, and 34 in 2009). This list does not include numerous other non-public complaints lodged against the BPD.

67.    These multiple civil rights complaints, civil actions, incidents witnessed by Relator Williams, and the BPD's attempts to bury any such complaints, are indicative of a pattern and practice of unlawful and discriminatory actions by the City of Brockton and the BPD. They also underscore the City's willingness and intent to conceal illegal conduct by BPD officers in order to protect itself and the BPD, which in turn enabled the receipt of a steady stream of Federal grants.

## A.    RELATOR WILLIAMS HELPS INITIATE THE *SEMEDO* CIVIL RIGHTS CASE

68.    Relator Williams helped initiate the *Semedo* civil rights case against BPD Sergeant Lon Elliot. He also testified against Sergeant Elliot in that case, which ultimately resulted in factual findings of discrimination against Elliot. The events leading up to the hearing began in the early morning hours of November 20, 2007, when BPD officers falsely arrested and

18

jailed Jose Semedo, a Brockton businessman of Cape Verdean descent, at the Brockton catering company where Mr. Semedo was overseeing a cleaning crew of 5-6 employees.

69.     Several BPD officers, all Caucasian, participated in the arrest, including Sergeant Lon Elliott, and Officers Shawn Baker, Arthur McNulty, and Jason Ford (the "Arresting Officers"). All of the Arresting Officers were Caucasian.

70.     Sergeant Elliott instigated the unlawful arrest of Mr. Semedo, in part for personal reasons related to Elliott's relationship with the recipient of a bad check, a Brockton businessman named George Carney. The Arresting Officers apprehended Mr. Semedo based on Sergeant Elliott's word that Mr. Semedo had an outstanding warrant for his arrest on larceny charges related to the bad check. Mr. Semedo offered to provide proof that the bad check had been taken care of; however, his offer was refused. At no point on November 20, 2007 did any of the Arresting Officers have a valid warrant for Mr. Semedo's arrest.

71.     Sergeant Elliot nonetheless told Officers Baker, McNulty, and Ford, untruthfully, that there was a confirmed warrant for Mr. Semedo's arrest related to an outstanding bad check written to Mr. Carney.

72.     After some back and forth, Sergeant Elliot told Mr. Semedo:

"Listen, you African jungle bunny. You owe George Carney money—you fuck with him you fuck with me. You people are ruining the city."

73.     The Arresting Officers then allowed, in a highly unusual police procedure, Mr. Semedo to speak with his workers, and change his clothing. While Mr. Semedo was walking around the business, Sergeant Elliot made ape-like gestures, including scratching his torso and under arms and protruding his lower lip. Mr. Semedo did not see these offensive gestures when Sergeant Elliot made them, but afterwards viewed them because on the catering

19

139505.00601/36227648v.3

company's security camera. In a subsequent BPD internal investigation, the Arresting Officers described Sergeant Elliot's conduct as "clowning around," "just being a goof," and "for the entertainment of the men."

74.     Shortly thereafter, the Arresting Officers escorted Mr. Semedo out of the business and Officer Baker arrested Mr. Semedo. Officer Baker transported Mr. Semedo to the BPD and assisted the on-duty booking officer, Officer Powers, with booking procedures, which included searching for Mr. Semedo's warrant.

75.     In Massachusetts, there are two types of warrants: Warrants in the "Q-1" database and warrants in the statewide Warrant Management System ("WMS"). The Q-1 database contains most warrants, including those that have been recalled or are invalid. The WMS database contains only active, valid warrants. Both the Q-1 and WMS databases are easily accessed. It is BPD policy to run all warrants for arrest in the WMS database prior to effecting the arrest.

76.     When Officer Baker ran Mr. Semedo's warrant, he was only able to locate the warrant in the Q-1 database, not the WMS database - - meaning they could not confirm a valid warrant existed. At that point, Mr. Semedo should have been set free, which would have occurred if Mr. Semedo had not been a minority, and had not been targeted by Sergeant Elliot. Instead, Officer Baker and other BPD officers continued the booking process and placed Mr. Semedo in a holding cell. While in the holding cell, Mr. Semedo heard Officer Baker say to another officer "this guy shouldn't be here."

77.     Later that evening, BPD Officer Andy Kalp began processing prisoner paperwork for arraignment hearings and noticed that Mr. Semedo was booked on a Q-1 warrant. After confirming that there was no WMS warrant for Mr. Semedo, Officer Kalp ran a master

20

name search, including searching the Board of Probation database ("BOP"). When even the BOP search failed to reveal a valid warrant for Mr. Semedo, Officer Kalp radioed Officer Baker via Nextel because he was the arresting officer. Officer Baker then contacted Sergeant Elliot, who told Officer Baker to instruct Officer Kalp to proceed with Mr. Semedo's arraignment.

78.     Later that night, Officer Kalp chided Officer Powers for unlawfully booking Mr. Semedo on a Q-1 warrant, which in essence amounted to a kidnapping. Officer Kalp told Officer Powers "I'll see you in Federal Court," which is understood by BPD police officers and Relator Williams to indicate that Kalp expected a Federal criminal charge or Federal civil rights action in Federal court.

79.     The next day, on November 21, 2007, Mr. Semedo was transported to Brockton District Court, but was not arraigned because the warrant relating to Mr. Semedo's debt to Mr. Carney had been recalled.

80.     Following Mr. Semedo's false arrest, Mr. Semedo spoke about the circumstances of his arrest with Relator Williams. Mr. Semedo told Relator Williams that he felt that his civil rights were violated, and that the Arresting Officers committed crimes by making or allowing to be made racially disparaging remarks, such as "jungle bunny" and "monkey," as well as ape-like gestures, in the course of falsely arresting Mr. Semedo.

81.     Relator Williams, who had long endured the racial bias of the BPD during his employment, believed that Mr. Semedo's arrest, and Sergeant Elliot's racist remarks, gestures, and comments, were unlawful and should be reported. Accordingly, Relator Williams advised and encouraged Mr. Semedo to report the incident to the on duty BPD shift supervisor, Captain Leone McCabe, and BPD's Internal Affairs Department ("IAD").

21

82.     The conversation between Mr. Semedo and Relator Williams occurred in the open for BPD officers to observe at the BPD and in the presence of other police officers. It was also known by the Mayor of Brockton, and a number of other BPD personnel, that Relator Williams had advised Mr. Semedo to report the Arresting Officers' conduct.

83.     As Relator Williams advised, Mr. Semedo reported Sergeant Elliot's unlawful conduct to Captain McCabe.

84.     After Mr. Semedo lodged his complaint with Captain McCabe, on the same day on which Relator Williams had counseled him to do so, Relator Williams overheard Detectives George Almeida and Dave Delehoy, as well as others in the Detectives Bureau, discussing Mr. Semedo's IAD complaint. Relator Williams joined the discussion and commented that he believed Mr. Semedo was illegally arrested. Out of fear of retaliation, Relator Williams was careful not to criticize the BPD, IAD, or Chief Conlon in this discussion, but rather expressed his belief that Internal Affairs would conduct a thorough investigation, which would result in disciplinary action, if necessary.

85.     Mr. Semedo also called other BPD officers regarding the incident, including Sergeants Barry and Celia, both of whom, according to policy, instructed Mr. Semedo to file a complaint with IAD. Sergeant Barry told Mr. Semedo to "be honest" with IAD and Sergeant Celia advised that IAD "can be fair." In actuality, however, IAD usually tried to minimize these complaints by failing to conduct a thorough investigation into the alleged officer misconduct.

86.     On or about December 1, 2007, BPD Sergeant Brian Leary, a member of IAD, told other officers that IAD was going to conduct an investigation into Mr. Semedo's arrest, and into Sergeant Elliot's conduct. Also in early December, Mr. Semedo completed an IAD

22

complaint form, which was mailed to him by Sergeant Leary. Mr. Semedo typed his complaint and submitted it to IAD in January 2008.

87. IAD did not initiate its investigation for over a month and a half after Mr. Semedo reported to Captain McCabe his unlawful arrest and Sergeant Elliot's racist behavior. On January 19-22, 2008, then-BPD Captain Emanuel Gomes and/or Sergeant Leary sent letters to the Arresting Officers and other BPD Officers who were on duty, requesting written summaries of the officers' involvement and observations "made from the time it was decided Mr. Semedo was to be encountered by the [BPD] till the time he released [sic] from our custody." The summaries were due on January 26, 2008.

88. Each of the officers who received a request for information from Captain Gomes or Sergeant Leary responded in writing by January 26, 2008, but Captain Gomes and Sergeant Leary delayed, and did not conduct follow-up interviews with the officers, Mr. Semedo, or Mr. Semedo's fellow employees at the catering company until March 6 and 13, 2008.

89. Following IAD's review of the officers' written summaries, the interviews conducted by Gomes and Leary, as well as BPD and Brockton District Court documents, IAD determined the following: (1) there was a valid warrant for Mr. Semedo's arrest on November 20, 2007 and BPD officers did not unlawfully arrest Mr. Semedo; (2) the investigation revealed "insufficient evidence to prove or disprove" that Sergeant Elliot uttered racial slurs to Mr. Semedo; and (3) Sergeant Elliot's gestures imitating a monkey constituted conduct unbecoming of a BPD officer.

90. Incredibly, these findings were made even though the officers' summaries were consistent with Mr. Semedo's description of discriminatory treatment and despite the fact that the officers effectively covered up the incident by failing to proactively report it.

23

91.     On December 12, 2008, well over a year after Mr. Semedo's unlawful arrest and Sergeant Elliot's discriminatory conduct, then-BPD Chief Conlon issued a five-day suspension to Sergeant Elliot and recommended that the City of Brockton's then-Mayor James Harrington conduct a hearing to consider additional discipline, up to and including discharge. Also on December 12, 2008, Mayor Harrington issued a letter recommending additional discipline, but not discharge.  Ultimately, Chief Conlon suspended Sergeant Elliot for a mere five days.

92.     The administrative five day suspension has been one of the BPD's preferred strategies to keep civil rights complainants appeased, while imposing minimal employment-related harm to the BPD police officers, especially for those white police officers who went along with the BPD's culture of bias and civil rights violations.

93.     After Sergeant Elliot appealed the five-day suspension ordered by Chief Conlon, the Hearing Officer conducted two full days and one partial day of hearing, receiving testimony from six witnesses, and reviewing thirty documents. The Hearing Officer then issued a report recommending that Sergeant Elliot be discharged from the BPD. *See In the Matter of the Five-Day Suspension and Contemplated Discharge of Sergeant Lon Elliot*, Report of Hearing Officer, at 1.

94.     Relator Williams testified at the hearing about prior misconduct by Elliot (but he was not called to testify about his conversations with Mr. Semedo). Chief Conlon, the Hearing Officer, Sergeant Elliott, and Mr. Semedo were all present during Williams' testimony.

95.     Incredibly, at no time after Relator Williams assisted in Semedo's reporting, during the Internal Affairs investigation, or at any time, was Relator Williams interviewed by any BPD or City official, even prior to the December 2008 hearing. This is an uncustomary

24

practice. Witnesses are always interviewed prior to testimony to fully understand the scope of their testimony based on what they know.

96. The lack of preparation to interview Relator Williams demonstrates deliberate vagueness and intent by City and BPD decision-makers to not thoroughly investigate the *Semedo* civil rights allegations, which is a consistent, albeit unwritten, City and BPD policy.

97. Moreover, before the hearing began, Captain Gomes encountered Relator Williams in the hallway of the building where the hearing was to occur, informed Relator Williams he (Captain Gomes) did not want to hurt Elliott, and attempted to encourage Relator Williams to testify untruthfully about Elliott. Despite Chief Gomes' prompting, at the hearing, however, Relator Williams provided truthful testimony.

98. The City and BPD also conspired to withhold from the *Semedo* Hearing Officer admission statements authored by Jason Ford, Shawn Baker, Arthur McNulty, Andy Kalp, Michael Powers and Lieutenant Williamson by obtaining second interviews of Jason Ford, Shawn Baker, Arthur McNulty, Andy Kalp, Michael Powers and Lieutenant Williamson. The second interviews included leading questions by then-Captain Gomes to procure and memorialize a second set of officer written statements that were less damaging than the statements from the first round of interviews. Unsurprisingly, the IAD investigation and testimony of the BPD police officers is riddled with inaccuracies, which are particularly obvious when comparing the original January 2008 officer statements against the subsequent March 2008 "do-over" interviews.

99. After an extensive evidentiary hearing, including testimony by Relator Williams, in a written report, the Hearing Officer made the following relevant findings:

25

a. Elliot arrested Semedo at his place of employment for a warrant that was not in effect. *Id.* at 3.

b. In arresting Semedo, Elliot made "racist and inappropriate statements," saying "Listen to me. You fucking African Jungle Bunny . . . . You people are destroying my City." *Id.* at 4, 11, 13. The Hearing Officer found the fact that Elliot made these statements in the course of an arrest to be an aggravating factor in his decision to recommend Elliot's discharge. *Id.* at 16.

c. In effecting Semedo's arrest, Elliot "mock[ed] Semedo because of his race" by "mak[ing] gestures mimicking a primate," such as scratching under his arms and protruding his jaw or lower lip. *Id.* at 4, 8. The Hearing Officer determined that "Elliot knew very well that he had made racist gestures mocking Jose Semedo. . . ." *Id.* at 10.

d. "Elliot was overzealous in his desire to arrest Semedo," and arrested Semedo on an alleged larceny warrant without checking BPD's warrant system to determine if there was an outstanding warrant against Semedo. *Id.* at 12. No such warrant existed at the time of Semedo's arrest. *Id.*

e. "Elliot's denial that he ever used the N-word in reference to a citizen of African-American descent, on duty, in uniform, and while exercising his arrest power as a Brockton police officer" was untruthful. *Id.* at 7. The Hearing Officer noted that the evidence showed Elliot had engaged in racist behavior in the course of his duties as a BPD officer as far back as 1988 or 1989. The evidence showed that, on one occasion, Elliot said to an arrestee "[p]ut your hands behind your back, you fuckin' nigger" while effecting the arrest. *Id.* at n.3, 16.

100. Referring to Elliot's conduct, the Hearing Officer noted that "[t]he effect on other officers is not hard to discern, and certainly minority officers would wonder how or why

26

Brockton would continue to employ a racist in a sworn police position." *Id.* at 14. He further stated: "I find Elliot's attitude towards his racist gestures to be both cavalier and inappropriate. . . . He seems to have no appreciation that a racist attitude has no place in the workplace, especially when displayed by a superior officer in front of subordinate officers. This is especially true given the grave responsibilities of police officers who are sworn to enforce our laws with utter impartiality." *Id.* at 15.

101. Sergeant Elliot is a prime example of a racist police officer's conduct being tolerated by the City and BPD for over twenty years. Even more remarkable is that Elliot not only remained employed, but he had been promoted – perfectly consistent with the City's and BPD's culture of bias.

102. By May 2008, although likely earlier, the City and BPD officials became aware that Relator Williams assisted Mr. Semedo, when Mr. Semedo informed BPD police officers he was assisted by Relator Williams. After this time, Relator Williams experienced retaliatory actions stemming from the Semedo case which continued until his unlawful termination in 2010.

103. While Relator Williams was later unlawfully terminated for his role in the Semedo case, the majority of the white police officers who were complicit in the Semedo civil rights violation and attempted concealment received benefits in rank and financial compensation.

104. Captain Gomes has become Chief Gomes. Andy Kalp, Shawn Baker, Arthur McNulty, Jason Ford, and Lieutenant Williamson were never terminated, disciplined or penalized for their complicity in knowingly keeping Mr. Semedo, a black man, incarcerated despite the fact that it becoming immediately obvious there was no warrant or criminal violation

27

to justify his remaining in police custody on November 20, 2007. Williamson's silence was also rewarded and he is now a Captain.

## B. *SEMEDO V. ELLIOT*

105.     A follow-on civil rights action has been filed by Mr. Semedo, *Semedo v. Elliot*, Civil Action No. 10-11976, which is a pending suit in the District of Massachusetts set for trial in 2013, and which stems from the incidents in the above mentioned Hearing Officer Report. Semedo sued Elliot, and the City of Brockton under 42 U.S.C. § 1983, for alleged violations of Mr. Semedo's constitutional rights.   Mr. Semedo claimed that Elliot arrested him unlawfully and that the arrest was racially motivated, as evidenced by Elliot's statements and derogatory gestures. Mr. Semedo also claimed that the City failed adequately to train, discipline, or supervise Elliot, leading to Elliot's alleged discriminatory conduct and violations of Mr. Semedo's constitutional rights.   On June 28, 2012, this Court denied Brockton's motion for summary judgment. *See Semedo v. Elliot*, No. 10-11976, 2012 U.S. Dist. LEXIS 89329 (D. Mass. June 28, 2012).   An interim pretrial conference was held on October 23, 2012 and a final pretrial conference is scheduled for February 6, 2013.

## C. *CENEUS V. KALP*

106.     As another example of the City's and BPD's pattern and practice of discrimination, on May 21, 2012, Bill Ceneus sued three BPD officers in the District of Massachusetts under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act. *See Ceneus v. Kalp*, Compl., Civil Action No. 12-10912. Mr. Ceneus, an African-American, claimed that the officers, specifically Officer Andrew Kalp (who was also involved in the *Semedo* case), unlawfully seized him by stopping him without reasonable suspicion, and then used excessive force by slamming Mr. Ceneus to the ground and handcuffing him. Mr. Ceneus also claimed

28

that he asked Kalp why Kalp stopped and attacked him, and that Kalp replied "you know what this is about." *See id.* ¶ 22.

107.    In Relator Williams' experience, the City and BPD have used racial profiling to stop minorities without reasonable suspicion, and have also used excessive force, like that experienced by Mr. Ceneus.

108.    The court entered a settlement order of dismissal on September 27, 2012.

### D.    *SUMMERS V. CITY OF BROCKTON*

109.    Another example of the City's and BPD's pattern and practice of discrimination is *Summers v. City of Brockton*, in which Mr. Summers, an African-American businessman, sued the City and various City officials, and BPD police officers for, among other things, violations of his civil and constitutional rights. *See* Compl., Civil Action No. 09-12006. Mr. Summers claimed that that BPD officers and City officials drummed up "false allegations of violence, disturbances, and criminal activity" at the bar, and engaged in "intimidating and coercive police conduct," as well as "starkly discrepant treatment of plaintiffs, an African-American [individual] and an establishment known and believed to cater to all races and ethnicities including African-Americans." *Id.* ¶¶ 11-15.

110.    In Relator Williams' experience, the City and BPD have treated minority businesses, like the bar owned by Mr. Summers, differently than white-owned businesses.

111.    On February 2, 2011, this case was dismissed via stipulation of dismissal.

### E.    *MEDINA V. COADY*

112.    Another example of the City's and BPD's pattern and practice of discrimination involves a suit under 42 U.S.C. § 1983 brought by Dennis Medina against BPD officer, the then BPD Chief William Conlon, former BPD Chief Paul Studenski, and the City. *See Medina v. Coady*, Civil Action No. 07-10985. Medina alleged that Officer Coady falsely

29

arrested Medina, who is Cape Verdean, and used excessive force in effecting the arrest. Medina also claimed that Conlon and Studenski violated his constitutional rights by failing to prevent officers from engaging in constitutional violations and failing to train officers on the use of force and guidelines for arrest.

113.    Officer Coady asserted his Fifth Amendment rights, rather than commit perjury in Brockton District Court, regarding his unlawful arrest and false report concerning Mr. Medina. On June 25, 2009, the case was dismissed.

114.    In Relator Williams' experience, the City and BPD falsely arrest minority citizens like Mr. Medina, and "stick together" to support racially biased police officers.

## F.    *ZHUANG V. SAQUET*

115.    Another example of the City's and BPD's pattern and practice of discrimination involves Xinrong Zhuang, an Asian-American resident of Brockton who sued BPD officer R. Saquet, the City of Brockton, and Brockton Hospital for violations of his civil and constitutional rights during and after Officer Saquet effected an arrest. *See generally* Compl., Civil Action No. 09-12163. Zhuang brought the action in this District claiming that BPD officers responded to a call Zhuang placed regarding a disagreement with his son, which involved a knife. *Id.* at 6-7. Though Zhuang had abandoned the knife prior to the officers' arrival, the officers tackled and handcuffed Zhuang, held him to the ground, and the officers and the hospital forced Zhuang to agree to unnecessary mental health treatments. *Id.* at ¶¶ 8-15. This case has been referred for alternative dispute resolution with Judge Judith G. Dein.

## G.    *NON-PUBLIC CASES AND FALSE REPORTING*

116.    In Relator Williams' experience working at the BPD, numerous civil rights violations and complaints are not made public, are minimized or quietly dismissed. For example, in 2008, in the wake of a non-public citizen civil rights complaint, Officer Patrick

30

O'Malley was permitted to resign to avoid possible criminal or administrative charges being levied against him in a permanent record.

117.    The City and the BPD benefit from concealing these types of complaints, as they are able to "close" the citizen complaint, and avoid reporting these types of civil rights violations, which potentially could result in criminal convictions, to the FBI's Uniform Crime Reporting ("UCR") Program.  UCR data is often considered by the Federal government in administering law enforcement grants.  The underreporting of UCR data, specifically those regarding civil rights criminal violations by BPD police officers, may have improperly altered the information DOJ considered when determining whether to award to BPD millions of dollars in COPS grants.

## H.    DEFENDANTS' PATTERN AND PRACTICE OF "PROTECTING THE INSTITUTION"

118.    The City of Brockton and BPD are charged with knowledge of the anti-discrimination and anti-abuse laws by which they must abide; however, BPD has not provided any training or guidance to inform new hires, or to remind existing law enforcement officers and employees, that BPD law enforcement officers and employees are prohibited from engaging in any form of discrimination or abusing their powers.

119.    At the same time, BPD and Brockton have purposefully conspired to protect themselves and individual BPD officers from liability for discriminatory conduct by implementing lax and opaque procedures for internal investigations by IA and failing properly to discipline officers that engage in misconduct.

120.    The roots of discrimination in the City run deep and discriminatory practices by police officers have been condoned and perpetuated by the City and BPD supervisors.  The service minority citizens have received from the BPD has been far different from what white citizens have experienced.  The police culture has been anchored by philosophical beliefs that

31

African-Americans and other minorities are second-class citizens and that violating the rights of these citizens will be protected by the institution. These destructive beliefs have been pervasive and pronounced throughout each BPD officer's career, beginning with the selection and hiring process and continuing through retirement or termination.

121.    The rationale by many white officers who accept this discriminatory standard has, throughout Relator Williams' career, been echoed by policy-makers, supervisors and patrolmen. For instance Lon Elliot, a known racist, was permitted by several senior level City and police department administrations to continue serving as a police officer despite demonstrated racist beliefs and conduct. Specifically, Elliot was a supervising policeman under Mayor Yunits and Chief Studenski, as well as Mayor Harrington and Chief Conlon, and was protected by IAD and Captain Gomes through December 2008. In addition, Mayor James Harrington told Cape Verdean citizens during a televised debate in September 2007, "Your kids are destroying the city." Several months later, Lon Elliot, with other white police officers, stated to a black citizen, "You people are destroying my city." Similarly, Mayor Balzotti and Chief Gomes have shielded police misconduct and under-reported civil rights violations.

122.    Despite the admissions by patrolmen in the *Semedo* illegal arrest and civil rights violations Captain Gomes attempted to protect the racist officers by explaining to the Hearing Officer that the known white racist officer should be given, "the benefit of doubt" over Semedo, the minority citizen.

123.    Police culture at the BPD has internally mirrored the level of service offered to minority citizens. For instance, it was common for Relator Williams to hear insults and name calling directed at Detective Nazaire Paul, who is Haitian, which were considered jokes by other BPD officers.  White officers, thinly veiling derogatory statements as jokes, would refer to

32

Detective Paul as "fucking Haitian" and "goat herder." Detective George Almeida, who is Cape Verdean, was also subjected to name calling and racially-tinged language that was nonetheless considered perfectly acceptable behavior by the senior-level city and police administrative managers.

124.    BPD officers have called members of the minority community these same offensive names without punishment or reprimand. This racist culture is expressed in unlawful "Stop & Frisk" polices, racial profiling and preferential hiring practices that favor Caucasians, often involving nepotism.

125.    Another example, not listed above, of the BPD's pattern and practice of discrimination and protecting the BPD involves Mr. Jeremiah Davila-Lynch, an experienced African-American Federal Air Marshall who was arrested in the City after witnessing BPD officers attempting to arrest another individual and asking if the officers needed help. *Id.* at 1-3. The BPD officers called Davila-Lynch a "monkey," a racial slur, and threatened to hurt him during the arrest. *Id.* at 4. Moreover, despite administering four different sobriety tests to Davila-Lynch and determining that he was "okay," the BPD officers decided to "lock him up anyway." *Id.* BPD Officer Dickenson was one of the arresting officers in this case. Additionally, the booking officer later told Relator Williams that Davila-Lynch did not appear intoxicated.

126.    The criminal charges the BPD attempted to have prosecuted against Davila-Lynch were dropped for want of prosecution, because Officer Dickenson could not state under oath that Davila-Lynch was driving under the influence and unlawfully carrying a firearm. In addition, Jeremiah and Laura Davila-Lynch brought suit in this judicial district against the City and two BPD officers asserting, among other things, that the officers violated Federal civil rights

33

laws and conspired to deprive Jeremiah Davila-Lynch of equal protection under the law. *See* Mem. & Order on Def.'s Mot. for Summ. J., Civil Action No. 09-10817 (D. Mass. Sept. 12, 2011). Although this civil action ultimately resulted in a jury verdict in favor of defendants, a current BPD police officer told Relator Williams that Officer Vincent Bowman lied during his testimony in the civil case because he feared that Chief Gomes and the City would retaliate against him. This BPD officer also told Relator Williams that Officer Bowman confided in this officer regarding his inaccurate testimony and fear of retaliation.

127.    The City's pattern and practice of civil rights violations regularly involves transforming valid complaints of criminal wrongdoing into lesser administrative charges.

128.    Between 1997 and 2007, Relator Williams and then-Captain, now Chief Gomes, had numerous private conversations regarding, among other things, the BPD and Internal Affairs investigation procedures. The conversations occurred in the Detectives Unit of the BPD.

129.    On or about March 1-5, 2001, while Gomes was serving as an IAD supervisor and BPD was investigating a shooting involving BPD Officer David Alexis, Gomes told Relator Williams that BPD has won most civil rights and other civil lawsuits because its policies are vague, and thus difficult to expressly violate, and BPD officers have often failed to properly follow the procedures and record-keeping requirements that do exist. In addition, on several occasions between 1998 and 2000, Relator Williams heard Gomes tell fellow officers that they should expect to be sued if they are doing their jobs properly. Gomes was a Sergeant in the Detectives Unit at this time.

130.    Gomes also told Relator Williams about numerous instances where Gomes and other BPD leaders encouraged police misconduct by failing to investigate properly and not

34

punishing officers for wrongdoing like use of excessive force, racial profiling, and evidence tampering. These instances demonstrate that Gomes, his predecessors, and other BPD officials have promoted a "deeply entrenched" culture of "bad policing" that is contrary to progressive, community policing philosophies – the very concept of the COPS program.

131.    The City and BPD also have shielded officers from adverse civil service determinations. At civil service hearings, BPD must present cause for an adverse determination, and, to do so, BPD theoretically relies on thorough IAD investigations. However, because IAD has failed to disclose all exculpatory evidence concerning officer misconduct, BPD often lacks sufficient cause to justify a hearing officer awarding an adverse determination—such as discipline or termination.

132.    Despite its purported commitment to community policing, BPD has, at all times relevant to this Complaint, failed to hire minority and/or bilingual officers as encouraged under the COPS program.

133.    In 2007, then-BPD Chief William K. Conlon admitted in a Boston.com news article that BPD had hired a minority in only two positions. *See* http://www.llrlaw.com/pdfs/Few_Minorities.pdf. In reality, both of those positions were held by the same individual, who was promoted from one position to the other.

134.    BPD has also failed to hire a sufficient number of bilingual officers to meet Brockton's needs. For example, BPD hired several officers in 1996 as "bilingual hires" under the COPS program even though BPD discovered that the officers misrepresented their language capabilities on their applications and other qualified candidates were available. The applicants fraudulently claimed that they were bilingual, but BPD discovered that they were not during a background check. Specifically, Thomas Spillane, an IA background investigator, administered

35

a pass/fail Spanish language test to the applicants and each failed. Nevertheless, BPD hired these individuals over minority candidates for the bilingual officer positions. Relator Williams was assigned as a temporary training officer for two of the officers hired, Nancy Leedberg and Jennifer Hayes, and noticed that neither was able to function adequately as a Spanish language interpreter in the field.

135.    Beyond encouraging and fostering discrimination, use of excessive force, illegal searches, racial profiling, and other civil rights violations, Defendants have engaged in a pattern of discriminatory employment practices. These practices have favored white police officers who buy into the culture of discrimination, as well as their family members (for example by extensive nepotism), and have rewarded police officers who "protect the institution," by preferential on- and off-duty assignments that pay substantial overtime.

## VI.    DEFENDANTS DEFRAUDED GOVERNMENT PROGRAMS BY SUBMISSION OF FALSE CLAIMS

136.    As set forth in this Complaint, the Defendants have violated the FCA by falsely certifying, or causing to be falsely certified, compliance with the COPS grant program. The FCA imposes civil liability where a person "knowingly presents, or causes to be presented" to the Government "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(2008), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B) (2010).

137.    It has been the plan and purpose of Defendants, beginning as early as 1995, and continuing through the present, to obtain grants from the COPS Program, based on false pretenses, by knowingly misrepresenting their compliance with civil rights laws on application forms and reports in order to induce payment of Government funds.

36

138.    It has also been the plan and purpose of Defendants to fraudulently obtain COPS grants by causing false and fraudulent Assurances and Certifications forms to be submitted for consideration by the COPS program.

139.    It has also been the plan and purpose of Defendants to avoid disclosure of Defendants' non-compliance with civil rights laws for the purpose of fraudulently obtaining Federal funds.

140.    Defendants have made or caused to be made misrepresentations and false certifications on applications for COPS grants, specifically on the Assurances and Certifications forms, that have resulted in the awarding of millions of dollars in Government funds, while avoiding penalties, as a direct result of these numerous express false certification claims.

141.    The City and BPD have employed a full-time grant coordinator to compile and submit its applications for COPS grants, as well as other Federal, state, and local grants. Michele Streitmater currently holds this position. Prior to 1997, Detective Paul Washek was responsible for researching and writing BPD grant applications.

142.    The Mayor of Brockton is the government executive responsible for ensuring that the BPD is in compliance with civil rights laws, and is responsible for signing the Assurances and Certification forms on the City's and BPD's COPS grant applications. In 2011, for example, Mayor Linda Balzotti certified compliance with Federal civil rights laws on BPD's application for COPS funds. The Mayor is charged with knowledge of the BPD's law enforcement practices and policies, including whether the BPD is in compliance with applicable COPS civil rights laws.

143.    The BPD Chief of Police is the law enforcement executive responsible for signing the Assurances and Certification forms on BPD's COPS grant applications. In 2011, for

37

example, then-Chief of BPD William Conlon certified compliance with Federal civil rights laws on BPD's application for COPS funds. The BPD Chief of Police Mayor is charged with knowledge of the BPD's law enforcement practices and policies, including whether the BPD is in compliance with applicable COPS civil rights laws.

144. As described in this Complaint, these certifications were materially false. Defendants knew, or it was reasonably foreseeable, that misrepresentations on the COPS application, specifically on the Assurances and Certifications forms, would lead to the submission of false claims to the Government, and ultimately, to the fraudulent receipt of COPS program grants.

145. For example, the certifications signed on May 25, 2011 by City of Brockton Mayor Balzotti, the BPD Chief William Conlon, and submitted by the City's grant coordinator Michele Streitmater, contain the following language:

Section 17: REVIEWS AND CERTIFICATIONS

**1)   Federal Civil Rights and Grant Reviews:**

Please be advised that an application may not be funded and, if awarded, a hold may be placed on the award if it is deemed that the applicant is not in compliance with Federal civil rights laws, and/or is not cooperating with an ongoing Federal civil rights investigation, and/or is not cooperating with a Department of Justice grant review or audit. (emphasis added)

146. Since at least 1995, the City and the BPD have not been "in compliance with Federal civil rights laws." As such, the 2011 COPS grants should not have been awarded. And, because BPD falsely certified all prior applications in the same manner, all COPS grants paid since 1995 should not have been funded.

38

147.    The certifications signed on May 25, 2011 by City of Brockton Mayor

Balzotti, the BPD Chief William Conlon, and submitted by the City's grant coordinator Michele

Streitmater, also contain the following language:

### 3)    Certification of Review and Representation of Compliance with Requirements:

The signatures of the Law Enforcement Executive/Agency Executive, Government Executive/Financial Official, and the Person Submitting this Application on the Reviews and Certifications represent to the COPS Office that:

a)  The signatories have been legally and officially authorized by the appropriate governing body to submit this application and act on behalf of the grant applicant entity;

b)  The applicant will comply with all legal, administrative, and programmatic requirements that govern the applicant for acceptance and use of Federal funds as outlined in the applicable COPS Application Guide; the COPS Grant Owner's Manual, Assurances, Certifications and all other applicable program regulations, laws, orders, and circulars;  (emphasis added)

c)  The applicant understands that false statements or claims made in connection with COPS programs may result in fines, imprisonment, debarment from participating in Federal grants, cooperative agreements, or contracts, and/or any other remedy available by law to the Federal government; (emphasis added) AND

d)  The information provided in this application, including any amendments, shall be treated as material representations of fact upon which reliance will be placed when the Department of Justice determines to award the covered grant. (emphasis added)

148.    Since at least 1995, the City and the BPD have not complied with "all legal,

administrative, and programmatic requirements that govern the applicant for acceptance and use

of Federal funds as outlined in the applicable COPS Application Guide; the COPS Grant

Owner's Manual, Assurances, Certifications and all other applicable program regulations, laws,

orders, and circulars." As such, the 2011 COPS grant should not have been awarded. And,

because BPD falsely certified all prior grant applications in the same manner, all COPS grants

paid since 1995 should not have been funded.

149. At all times relevant to this Complaint, the City and the BPD have received funds under various components of the COPS program, some which may have been granted under Federal programs other than COPS which similarly require compliance with civil rights laws.

150. From at least in or about 1995 through the present, in this judicial district, the City of Brockton and BPD did knowingly and willfully execute a scheme and artifice to defraud the COPS program and the DOJ, and to obtain, by means of materially false and fraudulent misrepresentations, Federal grant funds. To effect this scheme and artifice, the City of Brockton and BPD submitted false and fraudulent claims or records in the form of certifications on required COPS grant documentation.

151. From 1994 through January 4, 2010, BPD was awarded at least $4,861,432 in COPS grants. The grant numbers for grants accepted by Brockton or BPD include, but are not limited to: 96UMWX0866, 1999TCWX0112, 95DMBX 0178, 97CMWX1151, 96UMWX0866, 2011UMWX0074, 2011CKWX0032, 2008CKWX0336, and 2009RKWX0401.

152. BPD also was awarded at least $517,882 in 2011.

153. In 2003 and 2011, Brockton accepted COPS grants in the amounts of $50,000, and $489,947, respectively.

154. The City and the BPD also misused the funds obtained from the COPS grant program. Specifically, BPD engaged in a pattern and practice of unlawful discrimination while receiving these grants, and it misused the Federal grant funds by failing to hire sufficient numbers of police for foot patrols and minority officers, as well as by failing to fund other community policing activities.

40

155.    The City and BPD have falsely certified compliance with the COPS grant program, resulting in millions of dollars in grants that should not have been awarded. But for the City of Brockton's and BPD's fraudulent misrepresentations, neither would have received grant monies under the COPS program.

## COUNT I
## (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)).[1]

156.    Relator Williams incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

157.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented to the COPS Program false or fraudulent claims for payment or approval, in violation of 31 U.S.C. §§ 3729(a)(1) and 3729(a)(1)(A).

158.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, awarded, and may still be paying or providing funds, to Defendants under the COPS program.

159.    As a result of Defendants' actions, as set forth above, the United States of America has been, and continues to be, severely damaged.

---

[1] To the extent wrongdoing occurred after May 20, 2009, this Complaint should be deemed to include violations of the Federal FCA's recent amendments. The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), modified and renumbered the subsections of 31 U.S.C. § 3729(a), but only the amendments to former Section 3729(a)(2) were made retroactive. Pub. L. No. 111-21, § 4, 123 Stat. 1625. That provision was designed "to clarify and correct erroneous interpretations of the law" in decisions such as *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), *see* S. Rep. No. 111-10, 111th Cong., 1st Sess., at 10 (2009), and Congress thus specified that it "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date." Pub L. No. 111-21 § 4, 123 Stat. 1625. Thus, the old version of Section 3729(a)(1) and the new version of Section 3729(a)(2) – 31 U.S.C. § 3729(a)(1)(B) – apply to the claims in this case.

## COUNT II
### FALSE RECORDS OR STATEMENTS
### (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)).[2]

160.   Relator Williams incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

161.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. §§ 3729(a)(1)(B) and 3729(a)(2).

162.   The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, awarded, and may still be paying or providing funds, to Defendants under the COPS program.

163.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(A)(1)(C)).[3]

164.   Relator Williams incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

---

[2] To the extent wrongdoing occurred after May 20, 2009, this Complaint should be deemed to include violations of the Federal FCA's recent amendments.

[3] To the extent wrongdoing occurred after May 20, 2009, this Complaint should be deemed to include violations of the Federal FCA's recent amendments.

165. Defendants and Does 1-100 conspired to knowingly submit, or caused or be submitted, false or fraudulent claims, or false records and statements, to the United States to obtain Government grants, and to avoid re-payment or avoid penalties.

166. All Defendants have formed an agreement to submit each false claim.

167. All Defendants have committed an act in furtherance of the object of this Agreement.

168. Each Defendant has acted with the intent to defraud the United States.

169. As a proximate result of the aforesaid fraudulent conduct, the United States of America sustained damages in an amount to be proven at trial.

170. As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
## UNLAWFUL RETALIATION
## (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h).

171. Relator Williams incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

172. Relator Williams was employed by the BPD for nearly twenty years, until he raised legal compliance issues to his co-workers and superiors about unlawful police activity, and refused to cooperate in the BPD's concerted efforts to protect the institution.

173. As a result of Relator Williams' reports of unlawful conduct, on or about November 12, 2010, Relator Williams was constructively discharged from the BPD.

174. Prior to his discharge, Relator Williams endured continued harassment, humiliation and discrimination by the BPD, and has suffered extreme emotional distress.

43

**WHEREFORE**, Relator prays for judgment against Defendants as follows:

A.      That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq*.; or further engaging in unlawful discrimination, including declaratory and injunctive relief to rectify the Defendants' violations of law, and to ensure that Defendants implement sustainable reforms establishing Constitutional police practices, which will enhance public safety for all citizens in the City of Brockton, and ensure the people's Constitutional rights are not violated;

B.      That judgment be entered in Relator Williams' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729, plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.      That judgment be entered in Relator Williams' favor and against Defendants for Defendants' unlawful discrimination and retaliation as provided for in 31 U.S.C. § 3729(h), including compensatory, special and statutory damages, reasonable attorneys' fees and costs;

D.      That Relator Williams be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including reasonable attorneys' fees and litigation costs;

E.      That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

F.      That Relator Williams be granted such other and further relief as the Court deems just and proper.

44

## JURY TRIAL DEMAND

Relator Williams demands a trial by jury of all issues so triable.

Dated: November 27, 2012

Paul Lynch   (BBO# 557605)
The Law Office of Paul Lynch
185 Devonshire Street
Suite 301
Boston, Massachusetts 02110
Telephone:   617-426-1120
Facsimile:   617-348-2147


Thomas J. Poulin
Kierstan L. Carlson
Blank Rome LLP
Watergate
600 New Hampshire Ave., NW
Washington DC 20037
Telephone:   202-772-5986
Facsimile:   202-572-8432

*Counsel for Plaintiff/Relator*

45