UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | * | |
| KEN E. WILLIAMS, | * | |
| | * | |
| Plaintiff-Relator, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-cv-12193-IT |
| CITY OF BROCKTON, CITY OF | * | |
| BROCKTON POLICE DEPARTMENT, | * | |
| DOES 1-100 | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

August 5, 2016

TALWANI, D.J.

Plaintiff-Relator Ken Williams brings this action under the federal False Claims Act against the Brockton Police Department and the City of Brockton. Williams' Amended Complaint [#44] contends that Defendants falsely certified compliance with statutory, regulatory, and contractual requirements (including requirements not to discriminate on the basis of race), maintained false records, and conspired to submit false claims to the government, all in order to obtain funding from United States Department of Justice ("DOJ") grant programs. Before the court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [#45]. For the following reasons, the motion is ALLOWED IN PART and DENIED IN PART.

I.    Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), a court "presumes that the facts are as properly alleged by plaintiffs and/or reflected in other properly considered records, with

reasonable inferences drawn in plaintiffs' favor." <u>Abdallah v. Bain Capital LLC</u>, 752 F.3d 114, 119 (1st Cir. 2014) (citations omitted). To survive a motion to dismiss, a complaint must include factual allegations that, taken as true, demonstrate a plausible claim for relief. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555-58 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

II.   <u>Alleged Facts</u>

Williams was a Brockton police officer from October 30, 1995 until November 12, 2010. First Am. Compl. ¶ 15 [#44]. Williams alleges that the Brockton Police Department and the City of Brockton obtained grants from the DOJ by submitting false assurances and certifications that they would comply with civil rights and antidiscrimination laws and other administrative requirements.

Williams' First Amended Complaint identifies several grants received from the DOJ by the City of Brockton and/or the Brockton Police Department from 2003 through 2011, by date, amount, and/or grant number. <u>Id.</u> ¶¶ 68-72. Those grants include grants from the DOJ's Community Oriented Policing Services ("COPS") program and the Gang Resistance Education and Training, Project Safe Neighborhoods, and Edward Byrn Memorial JAG programs. <u>Id.</u>

A.   *Grant Requirements*

COPS is a program within the DOJ, created by the Violent Crime Control and Law Enforcement Act of 1994. <u>Id.</u> ¶ 28. COPS provides federal grants to help state and local law enforcement agencies hire community policing officers to work within communities, and since 1994, COPS has provided $14 billion in assistance to state and local law enforcement agencies to this end. <u>Id.</u> ¶ 28.

2

Applicants for and recipients of COPS grants are required to certify compliance with several requirements. Id. ¶ 40. In particular, COPS grant applicants must sign a standardized "Assurances" form as a part of the application. Id. ¶ 53. The Assurances form must be signed by both a law enforcement executive and a government executive or financial official. Id. The form states that the applicant "will comply with all legal and administrative requirements that govern the applicant for acceptance and use of Federal grant funds." Id. ¶¶ 53, 56. Among those requirements are "all requirements imposed by the [DOJ] as a condition or administrative requirement of the grant, including but not limited to: . . . applicable provisions of the Omnibus Crime Control and Safe Streets Act of 1968, as amended; . . . the applicable COPS Application Guides; [and] the applicable COPS Grant Owner's Manuals." Id. ¶ 57.

By signing the Assurances form, applicants also expressly assure that they "will not, on the ground of race, color, religion, national origin, gender, disability, or age, unlawfully exclude any person from participation in, deny the benefits of or employment to any person, or subject any person to discrimination in connection with any programs or activities funded in whole or in part with Federal funds." Id. ¶ 58. The Assurances form notes that these requirements "are found in the non-discrimination provision of the Omnibus Crime Control and Safe Streets Act of 1968, as amended (42 U.S.C. § 3789d); Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000d); the Indian Civil Rights Act (25 U.S.C. §§ 1301-1303); Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794); Title II, Subtitle A of the Americans with Disabilities Act (ADA) (42 U.S.C. § 1201, et seq.); the Age Discrimination Act of 1975 (42 U.S.C. § 6101, et seq.); and Department of Justice Non-Discrimination Regulations contained in Title 28, Parts 35 and 42 (subparts C, D, E, G and I) of the Code of Federal Regulations." Id.

Title VI in particular provides that "[n]o person in the United States shall, on the ground

of race, color, or national origin, be excluded from participation in, be denied the benefits of, or

be subjected to discrimination under any program or activity receiving Federal financial

assistance." 42 U.S.C. § 2000d. The Omnibus Crime Control and Safe Streets Act of 1968

prohibits the same forms of discrimination as well as discrimination on the basis of sex and

religion and the denial of employment in connection with any program or activity funded in

whole or in part under that law.  See 42 U.S.C. § 3789d(c). DOJ's regulations promulgated under

Title VI and 42 U.S.C. § 3789d (Title 28 of the C.F.R., Part 42, Subparts C and D) further

prohibit a recipient of federal funds from utilizing "criteria or methods of administration which

have the effect of subjecting individuals to discrimination" on the basis of race, color, sex,

religion, or national origin when determining the type of disposition, services, or benefits to

provide under any "program" or the class of individuals to whom and situations in which the

services will be provided.  28 C.F.R. § 42.104(b)(2); 28 C.F.R. § 42.203(e); see also First Am.

Compl. ¶ 101. The regulations define "program" broadly, including virtually all of the operations

of any unit of local government that receives any federal funds. 28 C.F.R. § 42.102(d); 28 C.F.R.

§ 42.202(k). Accordingly, the regulations prohibit unintentional discrimination by any entity that

receives any federal funds from DOJ, whether or not the discrimination occurs in the context of a

service specifically operated by those funds.

 COPS applicants and grantees must also sign a "Certifications" form. Am Compl. ¶ 62.

The 2011 Certifications form in particular required both a law enforcement and government

executive or financial official to represent that, among other things, the applicant "will comply

with all legal, administrative, and programmatic requirements that govern the application for

acceptance and use of Federal funds as outlined in the applicable COPS Application Guide; the

COPS Grant Owner's Manual, Assurances, Certifications and all other applicable program

regulations, laws, orders and circulars [.]" Id. ¶¶ 61, 92. Williams alleges that the funds granted

to the City and Brockton Police Department "under Federal programs other than COPS . . .

similarly require compliance with civil rights laws." Id. ¶ 94.

      The COPS Owner's Manual, distributed upon the award of a grant further reminds

grantees of their obligations under the COPS program, including their obligations with respect to

unlawful discrimination. Id. ¶ 63. The Owner's Manual also sets forth certain rules for

administering COPS grants. The 2012 COPS Hiring Program Grant Owner's Manual in

particular states that funds from that program "should be used for the payment of approved full-

time entry-level salaries and fringe benefits over three years, and that any costs above entry-level

salaries must be paid with local funds." Id. ¶ 76. Williams further alleges that "a statutory 'non-

supplanting requirement'" mandates that COPS grantees not use funds to replace state or local

funds that would, in the absence of federal aid, be made available for grant purposes. Id. ¶ 77.

Under the non-supplanting rules, COPS grantees must maintain the budgeted number of locally

funded officer positions after receiving COPS grants, maintain the required number of additional

police officers, and take steps to enhance community policing. Id.

      According to Williams, if a COPS applicant or grantee is found to be non-compliant with

"conditions for awarding and properly using COPS grants," various remedies are available to the

DOJ, including, but not limited to, withholding payments, requiring remittance of funds already

paid, and disqualification for future awards. Id. ¶ 65. Williams further alleges that, in 2009, DOJ

barred 25 state and local law enforcement agencies, as well as the Amtrak Police Department,

from receiving COPS grants for, among other things, failing to hire and retain a certain number

of officers as required, diverting grant funds for non-approved uses, being unable to account for

grant usage, and awarding government contracts through non-competitive processes—*i.e.*, non-

compliance with non-supplanting requirements. Id. ¶ 78.

     *B.   Defendants' Alleged Non-Compliance with Grant Requirements*

     Williams alleges that since 2002, Defendants have "not complied with 'all legal, administrative, and programmatic requirements'" that govern the use of COPS funds in particular, despite the signed Certifications forms saying they would. Id. ¶ 93.

     *1.   Civil Rights Violations in Violation of Title VI and 28 CFR Part 45(A)*

     First, Williams alleges that Defendants knowingly misrepresent compliance with Title VI and 28 C.F.R. Part 42(C) because Defendants "engaged in an ongoing pattern and practice of unlawful discrimination" while receiving COPS grants. Id. ¶¶ 98-99. Williams specifically alleges that several Brockton residents, many of whom are minorities, have filed civil rights actions under 42 U.S.C. § 1983 against Brockton Police Department officers, the Brockton Police Department and/or the City, and that the incidents underlying those lawsuits are examples of violations of Title VI and its implementing regulations. See First Am. Compl. ¶¶ 147-149 (describing Semedo v. Elliot, an action brought by man of Cape Verdean descent for false arrest and intentional discrimination (among other claims))[1]; id. ¶¶ 150-153 (describing Ceneus v. Kalp, an action brought by an African-American man for unreasonable seizure and excessive use of force)[2]; id. ¶¶ 154-157 (describing Summers v. City of Brockton, action brought by African-American man for "violation of constitutional rights," and alleging disparate treatment of African-Americans "motivated by racial animus")[3]; id. ¶¶ 158-160 (describing Medina v. Coady,

---

[1] According to the public docket, Semedo v. Elliot, Civil Action No. 10-11976-RWZ, was dismissed on March 8, 2013 after settlement and after the court denied Brockton's motion for summary judgment.

[2] According to the public docket, Ceneus v. Kalp, Civil Action No. 12-10912-LTS, was dismissed after a September 2012 settlement.

[3] According to the public docket, Summers v. City of Brockton, Civil Action No. 09-12006-DJC, was dismissed after settlement in February 2011.

action brought by Cape Verdean man for excessive use of force and false arrest)[4]; id. ¶¶ 161-163

(describing Zhuang v. Saquet, action brought by Asian-American man for excessive use of force

and related civil rights violations)[5]; id. ¶¶ 164-167 (describing Barbosa v. Hyland, action brought

by Cape Verdean couple alleging Fourth Amendment violations and excessive force and various

state-law torts)[6]; id. ¶¶ 186-187 (describing Davila-Lynch v. City of Brockton, action brought by

an African-American man, accusing Brockton Police Department officers of false arrest and

discrimination on the basis of race and use of a racial slur, ending in a jury verdict for

defendants)[7]. Williams asserts that the alleged incidents underlying these lawsuits are instances

of violations of Title VI and its implementing regulations because they allegedly involved

discrimination on the basis of race. Id. ¶¶ 149, 153, 157, 160, 163, 167.

Williams further alleges that Defendants violated Title VI and its implementing

regulations when they "targeted and marginalized" Bishop Felipe Teixeira, a religious and

community leader, by yelling at him to leave the police station on one occasion, obstructing his

ability to obtain permits to build and establish a church in Brockton, and by the Mayor not

addressing Bishop Teixeira's concerns about the lack of trust between the immigrant community

and the police department, all allegedly on the basis of Bishop Teixeira's race. Id. ¶¶ 171-173.[8]

---

[4] According to the public docket, Medina v. Coady, Civil Action No. 07-10985-PBS, was
dismissed after settlement in April 2009.
[5] According to the public docket, Zhuang v. Saquet, Civil Action No. 09-12163-NMG, summary
judgment was entered in favor of the defendants in June 2014.
[6] According to the public docket, judgment was entered for the plaintiffs after a bench trial in
Barbosa v. Hyland, Civil Action No. 11-11997-JGD.
[7] According to the public docket, Davila-Lynch v. City of Brockton, Civil Action No. 09-10187-
RGS, ended in a jury verdict for the defendants.
[8] Williams further alleges that the City and Police Department have a "pervasive culture of
disregard for the rights of minorities," First Am. Compl. ¶ 104, that officers "frequently
disparaged minorities" by using racial slurs, id., and that Defendants carried out their pattern and
practice of "protecting the institution" by failing to train officers and failing to investigate and
discipline officers accused of misconduct, id. ¶¶ 176-77, 190; see also id. ¶¶ 133-146 (detailing

2. *Employment Discrimination in Violation of the Omnibus Crime Control and Safe Streets Act of 1968 and 28 C.F.R. Part 42(D)*

Williams also alleges that Defendants engaged in employment discrimination in connection with its administration of COPS grants in violation of 42 U.S.C. § 3789d(c)(1) and 28 C.F.R. Part 42(D). Specifically, Williams alleges that Brockton Police Chief Conlon admitted to hiring minorities in only two positions in 2007. Id. ¶ 199. Additionally, Williams alleges that Defendants have subjected African-American officers to harassment and disparate treatment on the basis of race by assigning white officers to preferential assignments instead of or before assigning African-American officers, and assigning African-American officers to more difficult and dangerous cases. Id. ¶ 200.

3. *National Origin Discrimination in Violation of Title VI and 28 C.F.R. Part 42(C)*

Williams further alleges that Defendants have engaged in conduct that has disparately impacted Brockton minority residents on the basis of national origin. Specifically, Williams alleges that the Brockton Police Department failed to operate a mutilingual website, "because [the Department] knew that [a multilingual website] involved a greater potential to field more complaints from minority citizens with Limited English Language proficiency," and the Brockton Police Department's requirement that civilian complaints be written out in English has "the effect of[] treating minority citizens with [Limited English Proficiency] differently that English-speaking citizens." Id. ¶ 48.

---

an incident of allegedly inadequate investigation and discipline); see also id. ¶¶ 186-187 (alleging that a Brockton Police Department officer told Williams that he lied during his testimony in the Barbosa v. Hyland action because he feared retaliation by the Chief and the City)

*4.  Violation of Non-Supplanting Requirements*

Finally, Williams alleges that Defendants "violated the non-supplanting requirements of the COPS grants they received and used COPS grant funds for expenditures other than the allowable costs identified in the relevant COPS Program Owner's Manuals." Id. ¶ 79. In particular, Williams alleges that the Brockton Police Department reduced the number of filled sworn officer positions by unlawfully terminating officers, including through the use of forced retirements. Id. Williams alleges these actions violated the non-supplanting requirements, in part because "grantees are required to take active steps to fill vacancies created on or after the date of the grant, not create them." Id. ¶ 80.

III.   Discussion

The Amended Complaint alleges violations of the federal False Claims Act ("FCA") under 31 U.S.C. §§ 3729(a)(1)(A) (presentment of false claim), 3729(a)(1)(B) (creation or use of false record), and 3729(a)(1)(C) (conspiracy).[9] The Amended Complaint also alleges a violation of 31 U.S.C. § 3730(h) (retaliation).

*A.  Counts I-III*

Defendants raise numerous grounds for dismissal as to the first three causes of action, including that the First Amended Complaint fails to adequately plead fraud, materiality, and scienter with respect to Defendants' certifications of compliance with non-discrimination requirements. These arguments overlap in many respects. In United Health Services, Inc. v. United States, 136 S. Ct. 1989 (2016), the Supreme Court indicated that while the inquiries may proceed separately, they are interrelated. Indeed, the Supreme Court declined to adopt what it

---

[9] Williams also alleges violations of pre-Fraud Enforcement and Recovery Act counterparts 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(3).

deemed a "circumscribed view of what it means for a claim to be false or fraudulent" under the FCA, preferring instead to resolve concerns about fair notice and open-ended liability "through strict enforcement of the Act's materiality and scienter requirements." Id at 2002 (quoting United States v. Science Applications Int'l Corp., 626 F.3d 1257, 1269 (D.C. Cir. 2010)).[10] Under this framework, the FCA's falsity requirement is a relatively low threshold, but it is through application of the "rigorous" materiality and scienter standards that ordinary false claims get separated from *actionably* false claims under the FCA. Thus here, while Defendants' certifications of compliance may be found to be false in the event that Defendants did discriminate in violation of Title VI, 42 U.S.C. § 3789d, and their implementing regulations, the certifications may still not be actionable under the FCA.

In Universal Health Services, the Supreme Court described the "demanding" and "rigorous" materiality requirement, stating that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." Universal Health Servs., 136 S. Ct. at 2003; see also id. ("[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."). Nor is materiality established simply because the Government has the option to decline to pay a claim if a recipient fails to comply with a requirement of the grant. Id. Materiality may, however, be established where "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Id. Accordingly, to

----

[10] Because Universal Health Services was decided after the parties had fully briefed and argued the pending motion to dismiss, on June 17, 2016 the court invited the parties supplement their briefing to address that case and its discussion of the materiality requirement in particular. Order [#54].

determine whether Defendants' allegedly false certifications of compliance with Title VI, 42

U.S.C. § 3789d, and their implementing regulations were materially false under the FCA, the

court must examine the extent to which the Government actually has or would refuse to pay a

claim if it knows of non-compliance. <u>Universal Health Services</u>, 136 S.Ct. at 2003. Although

discovery may in many cases be necessary for this inquiry, a review of Title VI, 42 U.S.C.

§ 3789d, and their regulations demonstrates that a false certification of non-discrimination in this

case would not affect the government's decision to pay, unless and until there is a formal finding

of discrimination.

      For instance, Title VI provides that compliance with any portion of Title VI may be

affected by (1) termination or refusal to grant or continue assistance if there has been "an express

finding on the record, after opportunity for a hearing, of a failure to comply" or (2) any means

other than termination authorized by law, provided that no such action be taken until the federal

agency concerned has advised the appropriate person of the failure to comply and compliance

cannot be secured by voluntary means. 42 U.S.C. § 2000d-1. 28 C.F.R. § 42.108(c)

(implementing Title VI) further specifies that

> [n]o order suspending, terminating, or refusing to grant or continue Federal
> financial assistance shall become effective until:
>
> > (1) The responsible Department official has advised the applicant or
> > recipient of his failure to comply and has determined that compliance
> > cannot be secured by voluntary means;
> >
> > (2) There has been an express finding on the record, after opportunity for a
> > hearing, of a failure by the applicant or recipient to comply with a
> > requirement imposed by or pursuant to this subpart;
> >
> > (3) The action has been approved by the Attorney General pursuant to [28
> > C.F.R.] § 42.110, and
> >
> > (4) The expiration of 30 days after the Attorney General has filed with the
> > committee of the House and the committee of the Senate having

legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

See also 28 C.F.R. § 42.530 (adopting the procedures at 28 C.F.R. §§ 42.106-42.110 (in substantial part) for termination of or refusal to pay funds when applicant has not complied with disability discrimination regulations); 28 C.F.R. § 42.733(b)(2) (same as to age discrimination regulations).

Similarly, 42 U.S.C. § 3789d(c) provides that, when there has been a finding by a court or administrative agency (after notice and an opportunity for a hearing) that a pattern or practice of discrimination in violation of that statute has occurred, the Office of Justice Programs shall contact the "chief executive of the affected State, or the State in which the affected unit of local government is located, and the chief executive of such unit of local government" to notify them of such finding and to "secure compliance." 42 U.S.C § 3789(c)(2)(A). If compliance is not then secured within ninety days, and an administrative law judge has not made a determination that it is likely the State or unit of local government will prevail on the merits, the Office of Justice Programs must notify the Attorney General and "cause[] to have suspended further payment of any funds. . . ." 42 U.S.C. § 3789d(c)(2)(C)(ii); see also 28 C.F.R. § 42.210(a).

Thus, while both Title VI and 42 U.S.C. § 3789d prohibit discrimination on the basis of race by any entity that receives federal funds, the Government has chosen to address any such discrimination by terminating funding only after there is an express finding of discrimination. Because the Government has decided to address discrimination in this manner, any discrimination that occurs before a finding does not render the certifications *materially* false for the purposes of the FCA, as such discrimination—even though unlawful and counter to the mission of the COPS program—would not be a basis for the government to terminate funding.

This is not to say that a recipient who persists in discriminating after a formal finding of non-compliance, while certifying compliance with Title VI, 42 U.S.C. § 3789d, and their regulations, has not made a materially false claim under the FCA. But because there is no allegation that any such finding has occurred here, Williams' allegations that Defendants engaged in a pattern and practice of discrimination in violation of Title VI, 42 U.S.C. 3789d, and their regulations does not support a claim under the FCA.

The materiality of Defendants' compliance with the non-supplanting requirements presents a different question. While Williams does not identify the statutes that underlie those requirements, Williams does allege that the Government has with some frequency barred law enforcement agencies from receiving COPS grants because those agencies engaged in conduct that arguably violates the non-supplanting requirements. First Am. Compl. ¶ 78. This allegation is sufficient to raise a reasonable inference that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" with the non-supplanting requirements. Universal Health Servs., Inc., 136 S. Ct. at 2003. Accordingly, Williams has adequately alleged that compliance with those requirements is material to the Government's decision to pay.

Williams further alleges that Brockton Police Department has failed to comply with the non-supplanting rules. Specifically, Williams alleges that the non-supplanting rules mandate that COPS recipients maintain the budgeted number of locally funded officer positions after receiving COPS grants, and maintain the required number of additional police officers, id. ¶ 77, but that the Brockton Police Department cut the number of sworn officer positions, id. ¶ 79. Williams also sufficiently alleges that Defendants represented that they would comply with the non-supplanting requirements by way of the Certifications form which represents that "[t]he applicant will comply with all legal, administrative, and programmatic requirements that govern the

applicant for acceptance and use of Federal funds as outlined in the . . . COPS Grant Owner's Manual . . . and all other applicable program regulations, laws, orders, and circulars." Id. ¶ 92. Accordingly, Williams has adequately alleged that Defendants falsely certified their compliance with the non-supplanting requirements, and that this certification is material to the government's decision to pay COPS grants.[11]

Having concluded that Williams' allegations regarding compliance with non-supplanting requirements satisfy the demanding standard for materiality, the court now addresses Defendants' other arguments for dismissal to the extent they relate to those allegations.

### 1. Statute of Limitations

Defendants argue that any claims based on transactions prior to November 27, 2006 are barred by the FCA's six-year statute of limitations. The FCA's statute of limitations provision reads:

> A civil action under section 3730 may not be brought—
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

---

[11] The Amended Complaint identifies at least 3 other grants that Defendants received from DOJ outside of the COPS program. See First Am. Compl. ¶ 72. While the Amended Complaint alleges that those grant programs require compliance with non-discrimination laws and regulations, Williams does not allege that the non-supplanting rules apply to those non-COPS grant programs, nor that Defendants certified compliance with any such rules. See id. ¶ 9 (alleging that "[t]he false statements and claims described herein, which flow from Defendants' violations of civil rights laws, are based on Defendants' fraudulent and false certifications of compliance with Federal civil rights laws in applications for Federal grants, including those applications and grants related to [DOJ's COPS] program and the Justice Assistance Grant ("JAG") Program.") see also id. ¶¶ 30, 33. Accordingly, Williams has not alleged any materially false representation in connection with the Government's decision to pay any non-COPS grants.

31 U.S.C. § 3731(b). Some courts have construed subsection (2) (the ten year period) to apply only to actions brought by the government and subsection (1) (the six year period) to apply to actions brought by relators. See, e.g., United States ex rel. Sanders v. N. Am. Bus Indus. Inc., 546 F.3d 288, 293 (4th Cir. 2008). Others have concluded that subsection (2) applies to actions brought by relators when the government declines to intervene, reasoning that § 3731(b) states that it applies to "civil action[s] under § 3730" without distinguishing between actions brought by the government under § 3730(a) or relators under § 3730(b). See, e.g., United States ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1218 (9th Cir. 1996). A third line of cases holds that the three-year tolling provision in subsection (2) may apply to actions brought by relators, but that it does not begin to run until the government knows or should know of the alleged FCA violation. See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of Am., 474 F. Supp. 2d 75, 89 (D.D.C. 2007) (holding that the statute of limitations runs as follows: "(1) six years from the date of the violation; or (2) three years from the date when facts material to the right of action are or should be known to the relevant government official, whichever occurs last; but (3) in no event more than ten years after the violation is committed")

The last of these interpretations is best supported by the plain language of the statute. That is, a cause of action for violation of 31 U.S.C. § 3730 may be brought within six years of the date of the violation *or* within three years of the date the government learns of the violation, but in no event more than 10 years after the violation has occurred. For the purposes of this action, there is no allegation that the government official charged with responsibility to act in these circumstances knew or should have known of the allegations before Williams filed the initial complaint in this action on November 27, 2012. Accordingly, allegations of FCA violations occurring from November 27, 2002 forward are timely.

2.   *Public Disclosure Bar*

Defendants contend that Williams' allegations are also barred by the FCA's public disclosure bar, which requires the court to dismiss an FCA action where substantially all of the allegations of fraud have been publicly disclosed in a specified source prior to the relator filing suit, unless the relator is the original source of the allegations. See 31 U.S.C. § 3730(e)(4)(A); United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 53 (1st Cir. 2009). Defendants' public disclosure bar arguments are directed at Williams' allegations that Defendants falsely certified compliance with non-discrimination requirements, not the allegations that Defendants falsely certified compliance with the non-supplanting requirements. See Def.'s Mem. Law Supp. Mot Dismiss 8 [#46]. Indeed, Defendants point to no prior "public disclosure" of any information related to Defendants' staffing levels. Defendants have therefore not demonstrated at this time that the public disclosure bar applies to Williams' allegations regarding the non-supplanting requirements.

3.   *Claim for Payment*

Defendants next argue that the Amended Complaint fails to allege fraud with sufficient particularity. Causes of action under the 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(C) are subject to the heightened Rule 9(b) pleading standard for allegations of fraud. See United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009). In the FCA context, Rule 9(b) requires an FCA relator to "provide details that identify particular false claims for payment that were submitted to the government." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004). A complaint that provides some details as to the dates of claims, the identification numbers for claims, the contents of forms or bills submitted, the amount of money charged, the particular goods or services for which the government was billed,

and the individuals involved in the billing "may help a relator to state his or her claims with particularity." Id. at 233. While not all of this information need be provided, "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." Id. (citation omitted). The First Circuit has described this as an expectation that the pleader will specify "the who, what, where, and when of the allegedly false representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

Williams alleges that on May 25, 2011 Brockton Mayor Balzotti and Brockton Police Chief Conlon signed, and Brockton grant coordinator Michele Streitmater submitted, certifications stating that "the applicant will comply with all legal, administrative, and programmatic requirements that govern the application for acceptance and use of federal funds." First Am. Compl. ¶ 92. Williams further identifies specific COPS grants received in 2003, 2008, 2009 and 2011 by the amount of payment received, and in some cases the grant number and specific date of payment Id. ¶¶ 68-71. Thus, Williams has identified several claims for payment with sufficient particularity.

Defendants nevertheless contend that Williams' allegations regarding Defendants' non-compliance with the non-supplanting rules are inadequate under Rule 9(b) because Williams "does not articulate the names of the officers who were forced into retirement or unlawfully terminated, the dates and times of said transactions, the names of the officers who were hired to supplant the disciplined officers etc." Defs.' Mem. Law Supp. Mot. Dismiss 7 [#46]. These details are not necessary, at this stage, to adequately allege that Defendants failed to comply with the non-supplanting rules, namely by failing to maintain the required number of filled officer positions.

### 4.  Scienter

Finally, Defendants contend that the Amended Complaint fails to adequately plead scienter. The FCA's scienter requirement demands that an individual act "knowingly" in presenting a false claim or making or using a false record. 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B). The statute defines "knowing" and "knowingly" as having "actual knowledge" of information, or acting in "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The purpose of the scienter requirement is to avoid punishing "honest mistakes or incorrect claims submitted through mere negligence." United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 728 (4th Cir. 2010) (citation internal quotation marks omitted).

Again, the court understands Defendants' arguments regarding scienter to be directed at Williams' allegations of false certifications of compliance with non-discrimination requirements, not the non-supplanting requirements. Williams allegations that the Brockton Police Department intentionally reduced the number of sworn officer positions, First Am. Compl. ¶ 79, is sufficient to establish that Defendants knew or should have known that their representations that they would not do so were false.

For the foregoing reasons, Williams' allegations that Defendants falsely certified compliance with non-supplanting requirements are not barred by the statute of limitations or public disclosure bar, and Williams has adequately pleaded claims for payment, materiality, and scienter. Accordingly, Defendants' motion to dismiss is denied as to Counts I-III to the extent they are based on Defendants' allegedly false certifications of compliance with non-supplanting rules.

The court recognizes that the predominant focus of Williams' complaint is Defendants'

18

alleged discrimination. The court further recognizes Williams' allegations of discriminatory

policing do not exist in a vacuum. Indeed, in the time since Williams first filed his complaint

under seal in 2012 until today, the public has been inundated with news reports of police-

involved shootings and other incidents that many have argued were affected by biased policing.

Though Williams' allegations of discrimination present a serious issue, Williams has not

demonstrated that those allegations can support a cause of action under the FCA. See Universal

Health Servs., 136 S. Ct. at 2003 (noting that "[t]he False Claims Act is not 'an all purpose fraud

statute' or a vehicle for punishing . . . regulatory violations")

    *B.  Count IV*

    Finally, Williams asserts a fourth cause of action under 31 U.S.C. § 3730(h) for

retaliation. The FCA's anti-retaliation provision prohibits an employer from taking adverse

actions against any employee "because of lawful acts done by the employee . . . in furtherance of

an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more violations of [the FCA]." 31

U.S.C. § 3730(h)(1). To state a claim for retaliation under the FCA, "a plaintiff must demonstrate

that he or she engaged in activity protected under the FCA."  Karvelas, 360 F.3d at 236. In

addition, the employer must know that "the plaintiff is engaged in protected conduct, that is,

investigation or other activity concerning false or fraudulent claims that the employer knowingly

presented to the government."  Id. at 239.

    Williams' retaliation cause of action asserts that Williams was employed by the Brockton

Police Department "until he began raising complaints in or around 2005 regarding unlawful

police activity with his co-workers and supervisors, and refused to cooperate in the Brockton

Police Department's concerted efforts to protect the institution  and the false representations to

the public that had masked what Relator Williams knew was the truth concerning Defendants'

pattern and practice of Title VI violations." First Am. Compl. ¶ 218. Thus, Williams alleges that he was retaliated against for speaking out about discrimination and about misrepresentations made *to the public* regarding Defendants' violations of civil rights laws, but not for taking any action with respect to misrepresentations being made to the Government. Indeed, Williams' complaint nowhere alleges that he was engaged in any FCA-protected activity, such as investigating what he believed to be false claims presented to the Government. While Williams alleges numerous facts from which it could be inferred that he refused to cooperate with what he perceived to be a pattern and practice of discrimination, that refusal is not conduct protected by the FCA's anti-retaliation provisions. Accordingly, Williams fails to state a cause of action for retaliation under the FCA.

IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [#45] is ALLOWED as to Count IV and DENIED as to Counts I-III. Counts I-III are limited to Defendants' allegedly false certification of compliance with non-supplanting requirements. Discovery will be limited to issues relevant to those allegations only.

IT IS SO ORDERED.

Date: August 5, 2016                                                  /s/ Indira Talwani
                                                                     United States District Judge