UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | * | |
| KEN E. WILLIAMS, | * | |
| | * | |
| Plaintiff-Relator, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 12-cv-12193-IT |
| CITY OF BROCKTON, CITY OF | * | |
| BROCKTON POLICE DEPARTMENT, | * | |
| DOES 1-100 | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER[1]

December 23, 2016

TALWANI, D.J.

Plaintiff-Relator Ken Williams brings this action under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, 3730, against the Brockton Police Department and the City of Brockton. His Amended Complaint [#44] contends that Defendants falsely certified compliance with statutory, regulatory, and contractual requirements (including requirements not to discriminate on the basis of race), maintained false records, and conspired to submit false claims to the government, all in order to obtain funding from United States Department of Justice ("DOJ") grant programs. On reconsideration, Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [#45] is ALLOWED IN PART and DENIED IN PART.

---

[1] This Memorandum & Order replaces the Memorandum & Order [#59] filed on August 5, 2016. See Order [#75] (allowing Williams Motion for Reconsideration of the Court's August 5, 2016 Order [#61] and, on reconsideration, vacating Memorandum & Order [#59]).

A.  *Legal Standard*

In considering a motion to dismiss under Rule 12(b)(6), a court "presumes that the facts are as properly alleged by plaintiffs and/or reflected in other properly considered records, with reasonable inferences drawn in plaintiffs' favor." Abdallah v. Bain Capital LLC, 752 F.3d 114, 119 (1st Cir. 2014) (citations omitted). To survive a motion to dismiss, a complaint must include factual allegations that, taken as true, demonstrate a plausible claim for relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-58 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

B.  *Alleged Facts*

Williams was a Brockton police officer from October 30, 1995, until November 12, 2010. First Am. Compl. ¶ 15 [#44]. Williams alleges that the Brockton Police Department and the City of Brockton obtained grants from the DOJ by submitting false assurances and certifications that they would comply with civil rights and antidiscrimination laws and other administrative requirements.

Williams' Amended Complaint identifies several grants received from the DOJ by the City of Brockton and/or the Brockton Police Department from 2003 through 2011, by date, amount, and/or grant number. Id. ¶¶ 68-72. Those grants include grants from the DOJ's Community Oriented Policing Services ("COPS") program and the Gang Resistance Education and Training, Project Safe Neighborhoods, and Edward Byrn Memorial JAG programs. Id.

1.  Grant Requirements

COPS is a program within the DOJ, created by the Violent Crime Control and Law Enforcement Act of 1994. Id. ¶ 28. COPS provides federal grants to help state and local law

2

enforcement agencies hire community policing officers to work within communities, and since 1994, COPS has provided $14 billion in assistance to state and local law enforcement agencies to this end. Id.

Applicants for and recipients of COPS grants are required to certify compliance with several requirements. Id. ¶ 40. In particular, COPS grant applicants must sign a standardized "Assurances" form as a part of the application. Id. ¶ 53. The Assurances form must be signed by both a law enforcement executive and a government executive or financial official. Id. The form states that the applicant "will comply with all legal and administrative requirements that govern the applicant for acceptance and use of Federal grant funds." Id. ¶¶ 53, 56. Among those requirements are "all requirements imposed by the [DOJ] as a condition or administrative requirement of the grant, including but not limited to: . . . applicable provisions of the Omnibus Crime Control and Safe Streets Act of 1968, as amended; . . . the applicable COPS Application Guides; [and] the applicable COPS Grant Owner's Manuals." Id. ¶ 57.

By signing the Assurances form, applicants also expressly assure that they "will not, on the ground of race, color, religion, national origin, gender, disability, or age, unlawfully exclude any person from participation in, deny the benefits of or employment to any person, or subject any person to discrimination in connection with any programs or activities funded in whole or in part with Federal funds." Id. ¶ 58. The Assurances form notes that these requirements "are found in the non-discrimination provision of the Omnibus Crime Control and Safe Streets Act of 1968, as amended (42 U.S.C. § 3789d); Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000d); the Indian Civil Rights Act (25 U.S.C. §§ 1301-1303); Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794); Title II, Subtitle A of the Americans with Disabilities Act (ADA) (42 U.S.C. § 1201, et seq.); the Age Discrimination Act of 1975 (42

U.S.C. § 6101, et seq.); and Department of Justice Non-Discrimination Regulations contained in Title 28, Parts 35 and 42 (subparts C, D, E, G and I) of the Code of Federal Regulations." Id.

Title VI in particular provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Omnibus Crime Control and Safe Streets Act of 1968 prohibits the same forms of discrimination as well as discrimination on the basis of sex and religion and the denial of employment in connection with any program or activity funded in whole or in part under that law. See id. § 3789d(c). DOJ's regulations promulgated under Title VI and 42 U.S.C. § 3789d (Title 28 of the C.F.R., Part 42, Subparts C and D) further prohibit a recipient of federal funds from utilizing "criteria or methods of administration which have the effect of subjecting individuals to discrimination" on the basis of race, color, sex, religion, or national origin when determining the type of disposition, services, or benefits to provide under any "program" or the class of individuals to whom and situations in which the services will be provided. 28 C.F.R. § 42.104(b)(2); 28 C.F.R. § 42.203(e); see also First Am. Compl. ¶ 101 [#44]. The regulations define "program" broadly, including virtually all of the operations of any unit of local government that receives any federal funds. 28 C.F.R. § 42.102(d); 28 C.F.R. § 42.202(k). Accordingly, the regulations prohibit unintentional discrimination by any entity that receives any federal funds from DOJ, whether or not the discrimination occurs in the context of a service specifically operated by those funds.

COPS applicants and grantees must also sign a "Certifications" form. First Am. Compl. ¶ 62 [#44]. The 2011 Certifications form in particular required both a law enforcement and government executive or financial official to represent that, among other things, the applicant

"will comply with all legal, administrative, and programmatic requirements that govern the application for acceptance and use of Federal funds as outlined in the applicable COPS Application Guide; the COPS Grant Owner's Manual, Assurances, Certifications and all other applicable program regulations, laws, orders and circulars [.]" Id. ¶¶ 61, 92. Williams alleges that the funds granted to the City and Brockton Police Department "under Federal programs other than COPS . . . similarly require compliance with civil rights laws." Id. ¶ 94.

The COPS Owner's Manual, distributed upon the award of a grant, further reminds grantees of their obligations under the COPS program, including their obligations with respect to unlawful discrimination. Id. ¶ 63. The Owner's Manual also sets forth certain rules for administering COPS grants. The 2012 COPS Hiring Program Grant Owner's Manual in particular states that funds from that program "should be used for the payment of approved full-time entry-level salaries and fringe benefits over three years, and that any costs above entry-level salaries must be paid with local funds." Id. ¶ 76. Williams further alleges that "a statutory 'non-supplanting requirement'" mandates that COPS grantees not use funds to replace state or local funds that would, in the absence of federal aid, be made available for grant purposes. Id. ¶ 77. Under the non-supplanting rules, COPS grantees must maintain the budgeted number of locally funded officer positions after receiving COPS grants, maintain the required number of additional police officers, and take steps to enhance community policing. Id.

According to Williams, if a COPS applicant or grantee is found to be non-compliant with "conditions for awarding and properly using COPS grants," various remedies are available to the DOJ, including, but not limited to, withholding payments, requiring remittance of funds already paid, and disqualification for future awards. Id. ¶ 65. Williams further alleges that, in 2009, DOJ barred 25 state and local law enforcement agencies, as well as the Amtrak Police Department,

from receiving COPS grants for, among other things, failing to hire and retain a certain number

of officers as required, diverting grant funds for non-approved uses, being unable to account for

grant usage, and awarding government contracts through non-competitive processes—*i.e.*, non-

compliance with non-supplanting requirements. Id. ¶ 78.

### 2.   Defendants' Alleged Non-Compliance with Grant Requirements

Williams alleges that since 2002, Defendants have "not complied with 'all legal,

administrative, and programmatic requirements'" that govern the use of COPS funds in

particular, despite the signed Certifications forms saying they would. Id. ¶ 93.

### a.   *Civil Rights Violations in Violation of Title VI and 28 CFR Part 45(A)*

First, Williams alleges that Defendants knowingly misrepresent compliance with Title VI

and 28 C.F.R. Part 42(C) because Defendants "engaged in an ongoing pattern and practice of

unlawful discrimination" while receiving COPS grants. Id. ¶¶ 98-99. Williams specifically

alleges that several Brockton residents, many of whom are minorities, have filed civil rights

actions under 42 U.S.C. § 1983 against Brockton Police Department officers, the Brockton

Police Department and/or the City, and that the incidents underlying those lawsuits are examples

of violations of Title VI and its implementing regulations. See id. ¶¶ 147-149 (describing

Semedo v. Elliot, an action brought by man of Cape Verdean descent for false arrest and

intentional discrimination (among other claims))[2]; id. ¶¶ 150-153 (describing Ceneus v. Kalp, an

action brought by an African-American man for unreasonable seizure and excessive use of

force)[3]; id. ¶¶ 154-157 (describing Summers v. City of Brockton, action brought by African-

---

[2] According to the public docket, Semedo v. Elliot, Civil Action No. 10-11976-RWZ, was
dismissed on March 8, 2013 after settlement and after the court denied Brockton's motion for
summary judgment.
[3] According to the public docket, Ceneus v. Kalp, Civil Action No. 12-10912-LTS, was
dismissed after a September 2012 settlement.

American man for "violation of constitutional rights," and alleging disparate treatment of African-Americans "motivated by racial animus")[4]; id. ¶¶ 158-160 (describing Medina v. Coady, action brought by Cape Verdean man for excessive use of force and false arrest)[5]; id. ¶¶ 161-163 (describing Zhuang v. Saquet, action brought by Asian-American man for excessive use of force and related civil rights violations)[6]; id. ¶¶ 164-167 (describing Barbosa v. Hyland, action brought by Cape Verdean couple alleging Fourth Amendment violations and excessive force and various state-law torts)[7]; id. ¶¶ 186-187 (describing Davila-Lynch v. City of Brockton, action brought by an African-American man, accusing Brockton Police Department officers of false arrest and discrimination on the basis of race and use of a racial slur, ending in a jury verdict for defendants).[8] Williams asserts that the alleged incidents underlying these lawsuits are instances of violations of Title VI and its implementing regulations because they allegedly involved discrimination on the basis of race. Id. ¶¶ 149, 153, 157, 160, 163, 167.

Williams further alleges that Defendants violated Title VI and its implementing regulations when they "targeted and marginalized" Bishop Felipe Teixeira, a religious and community leader, by yelling at him to leave the police station on one occasion, obstructing his ability to obtain permits to build and establish a church in Brockton, and by the Mayor not addressing Bishop Teixeira's concerns about the lack of trust between the immigrant community

---

[4] According to the public docket, Summers v. City of Brockton, Civil Action No. 09-12006-DJC, was dismissed after settlement in February 2011.

[5] According to the public docket, Medina v. Coady, Civil Action No. 07-10985-PBS, was dismissed after settlement in April 2009.

[6] According to the public docket, Zhuang v. Saquet, Civil Action No. 09-12163-NMG, summary judgment was entered in favor of the defendants in June 2014.

[7] According to the public docket, judgment was entered for the plaintiffs after a bench trial in Barbosa v. Hyland, Civil Action No. 11-11997-JGD.

[8] According to the public docket, Davila-Lynch v. City of Brockton, Civil Action No. 09-10817-RGS, ended in a jury verdict for the defendants.

and the police department, all allegedly on the basis of Bishop Teixeira's race. Id. ¶¶ 171-173.[9]

> b. *Employment Discrimination in Violation of the Omnibus Crime Control and Safe Streets Act of 1968 and 28 C.F.R. Part 42(D)*

Williams also alleges that Defendants engaged in employment discrimination in connection with its administration of COPS grants in violation of 42 U.S.C. § 3789d(c)(1) and 28 C.F.R. Part 42(D). Specifically, Williams alleges that Brockton Police Chief Conlon admitted to hiring minorities in only two positions in 2007. Id. ¶ 199. Additionally, Williams alleges that Defendants have subjected African-American officers to harassment and disparate treatment on the basis of race by assigning white officers to preferential assignments instead of or before assigning African-American officers, and assigning African-American officers to more difficult and dangerous cases. Id. ¶ 200.

> c. *National Origin Discrimination in Violation of Title VI and 28 C.F.R. Part 42(C)*

Williams further alleges that Defendants have engaged in conduct that has disparately impacted Brockton minority residents on the basis of national origin. Specifically, Williams alleges that the Brockton Police Department failed to operate a mutilingual website, "because [the Department] knew that [a multilingual website] involved a greater potential to field more complaints from minority citizens with Limited English Language proficiency," and the Brockton Police Department's requirement that civilian complaints be written out in English has

---

[9] Williams further alleges that the City and Police Department have a "pervasive culture of disregard for the rights of minorities," First Am. Compl. ¶ 104, that officers "frequently disparaged minorities" by using racial slurs, id., and that Defendants carried out their pattern and practice of "protecting the institution" by failing to train officers and failing to investigate and discipline officers accused of misconduct, id. ¶¶ 176-77, 190; see also id. ¶¶ 133-146 (detailing an incident of allegedly inadequate investigation and discipline); see also id. ¶¶ 186-187 (alleging that a Brockton Police Department officer told Williams that he lied during his testimony in the Barbosa v. Hyland action because he feared retaliation by the Chief and the City).

"the effect of[] treating minority citizens with [Limited English Proficiency] differently that English-speaking citizens." <u>Id.</u> ¶ 48.

### d.  *Violation of Non-Supplanting Requirements*

Finally, Williams alleges that Defendants "violated the non-supplanting requirements of the COPS grants they received and used COPS grant funds for expenditures other than the allowable costs identified in the relevant COPS Program Owner's Manuals." <u>Id.</u> ¶ 79. In particular, Williams alleges that the Brockton Police Department reduced the number of filled sworn officer positions by unlawfully terminating officers, including through the use of forced retirements. <u>Id.</u> Williams alleges these actions violated the non-supplanting requirements, in part because "grantees are required to take active steps to fill vacancies created on or after the date of the grant, not create them." <u>Id.</u> ¶ 80.

### C.  <u>Discussion</u>

The Amended Complaint alleges FCA violations under 31 U.S.C. §§ 3729(a)(1)(A) (presentment of false claim), 3729(a)(1)(B) (creation or use of false record), and 3729(a)(1)(C) (conspiracy).[10] The Amended Complaint also alleges a violation of 31 U.S.C. § 3730(h) (retaliation).

### 1.  <u>Counts I, II, and III</u>

Defendants raise numerous grounds for dismissal as to the first three causes of action. Namely, they argue that Williams has failed to adequately plead the falsity requirement under the FCA with respect to fraud, materiality, and scienter. They further contend that Counts I, II, and III are foreclosed by the statute of limitations and the FCA public disclosure bar.

---

[10] Williams also alleges violations of pre-Fraud Enforcement and Recovery Act counterparts 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(3).

*a.   FCA Falsity Requirement*

There is substantial overlap in Defendants' arguments that the Amended Complaint fails to adequately plead fraud, materiality, and scienter with respect to Defendants' certifications of compliance with non-discrimination requirements. In United States ex rel. Escobar v. Universal Health Services, 136 S. Ct. 1989 (2016), the Supreme Court indicated that, while the inquiries may proceed separately, they are interrelated. Indeed, the Supreme Court declined to adopt what it deemed a "circumscribed view of what it means for a claim to be false or fraudulent" under the FCA, preferring instead to resolve concerns about fair notice and open-ended liability "through strict enforcement of the Act's materiality and scienter requirements." Id. at 2002 (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1269 (D.C. Cir. 2010)).[11] Under this framework, the FCA's falsity requirement is a relatively low threshold, but it is through application of the "rigorous" materiality and scienter standards that ordinary false claims get separated from *actionable* false claims under the FCA.

i.   Materiality

To be cognizable under the FCA, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." Id. at 1996. "[M]ateriality cannot rest on 'a single fact or occurrence as always determinative,'" id. at 2001 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 39 (2011)), nor can it "be found where noncompliance is minor or insubstantial," id. at 2003. In

---

[11] Because Universal Health Services was decided after the parties had fully briefed and argued the pending motion to dismiss, on June 17, 2016, the court invited the parties to supplement their briefing to address that case, and its discussion of the materiality requirement in particular. Order [#54].

<u>Universal Health Services</u>, the Supreme Court clarified the proof required to satisfy the

"rigorous" and "demanding" materiality requirement:

> [T]he Government's decision to expressly identify a provision as a
> condition of payment is relevant, but not automatically dispositive.
> Likewise, proof of materiality can include, but is not necessarily
> limited to, evidence that the defendant knows that the Government
> consistently refuses to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory, or
> contractual requirement. Conversely, if the government pays a
> particular claim in full despite its actual knowledge that certain
> requirements were violated, that is very strong evidence that those
> requirements are not material. Or, if the Government regularly
> pays a particular type of claim in full despite actual knowledge that
> certain requirements were violated, and has signaled no change in
> position, that is strong evidence that the requirements are not
> material.

<u>Id.</u> at 2003-04.

Consequently, in passing on a FCA claim, "courts are to conduct a holistic approach to

determining materiality in connection with a payment decision, with no one factor being

necessarily dispositive." <u>United States ex rel. Escobar v. Univ. Health Servs.</u>, 842 F.3d 103, 109

(1st Cir. 2016) (<u>Univ. Health Servs. II</u>). "[T]he fundamental inquiry is 'whether a piece of

information is sufficiently important to influence the behavior of the recipient.'" <u>Id.</u> at 110

(quoting <u>United States ex rel. Winkelman v. CVS Caremark Corp.</u>, 827 F.3d 201, 211 (1st Cir.

2016)).

The non-compliance alleged in <u>Universal Health Services</u> is instructive. In that case, the

plaintiff-relators alleged that the defendant counseling center employed unlicensed and

unsupervised mental health providers in violation of state regulations and fraudulently submitted

claims for payment for the services these employees provided, even though regulations limited

their payments to services performed by licensed or supervised professionals. <u>Univ. Health</u>

<u>Servs.</u>, 136 S. Ct. at 1997-98. On remand, the United States Court of Appeals for the First Circuit

determined that the defendant's alleged misrepresentations were material, in part because "the centrality of the licensing and supervision requirements in the MassHealth regulatory program, which go to the very essence of the bargain[] of MassHealth's contractual relationships with various healthcare providers under the Medicaid program, is strong evidence that a failure to comply with the regulations would be sufficiently important to influence the behavior of the government in deciding whether to pay the claims." Univ. Health Servs. II, 842 F.3d at 110 (internal quotation marks and citations omitted). In so doing, the First Circuit noted that the expectation that mental health providers are appropriately trained and credentialed lies "[a]t the core" of the regulatory scheme. Id. at 111.

With this backdrop set, the court first turns to whether Defendants' allegedly false certifications of compliance with Title VI, 42 U.S.C. § 3789d, and their implementing regulations were materially false under the FCA. Defendants argue that the DOJ continued to award COPS grants to the City of Brockton in 2011, even though most of the lawsuits Williams cited in the Amended Complaint were filed before 2009. According to Defendants, since the government was on notice of these lawsuits—and the lack of findings of discriminatory practice—its continuous funding of COPS grants constitutes strong evidence that compliance with federal civil rights laws is not material to its payment decision. However, the Amended Complaint is void of any allegation that the DOJ had actual knowledge that these requirements were violated. Moreover, even assuming the DOJ possessed actual knowledge, this is not determinative in the court's holistic review of materiality. See Univ. Health Servs. II, 842 F.3d at 110 ("[W]hile the Supreme Court observed that 'if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence

that those requirements are not material,' the Court did not state that such knowledge is dispositive." (quoting Univ. Health Servs., 136 S. Ct. at 2003-04) (internal citation omitted)).[12]

Other factors tilt toward a finding that the failure to disclose Defendants' non-compliance of federal civil rights laws was material. First, the Amended Complaint alleges that "[r]acially neutral and non-discriminatory policing are a central tenet" and "a core value" of the COPS program, First Am. Compl. ¶ 34, because the program was designed to build trust and relationships with members of the Brockton community, id. ¶ 28. Accordingly, when reasonable inferences are drawn in Williams' favor—as they must be at the motion-to-dismiss stage, Abdallah, 752 F.3d at 119—the significance of the alleged non-compliance here is akin to that in Universal Health Services, in which central to MassHealth's decision to pay the defendant's claims was its expectation that the services it covered were performed by credentialed or supervised mental health providers. Like the expectation in Universal Health Services, Williams alleges that a grantee's compliance with federal civil rights laws "go[es] to the very essence of the bargain" of the DOJ's decision to provide COPS program funding. Univ. Health Servs. II, 842 F.3d at 110 (quoting Univ. Health Servs., 136 S. Ct. at 2003 n.5). Defendants' alleged pattern and practice of discrimination of minorities through their policing techniques, suppression of complaints, and employment practices would directly subvert the COPS program's goal of promoting community-based approaches to law enforcement. Therefore, the

---

[12] This court's prior Order [#59] focused on the administrative schemes set forth by Title VI, 42 U.S.C. § 3789d, and regulations for terminating funding on the basis of non-compliance. Mem. & Order 10-13. In its Statement of Interest [#66] submitted in support of Williams' Motion for Reconsideration of the Court's August 5, 2016 Order [#61], the Government articulated concerns with a focus on administrative schemes for terminating funding as a means for determining materiality. In any event, in light of the "holistic approach" outlined by the First Circuit, Univ. Health Servs. II, 842 F.3d at 109, the court no longer relies on the administrative schemes as the determinant of materiality.

centrality of racially-neutral and non-discriminatory policing to the COPS program is strong evidence that a grantee's non-compliance would have the tendency to influence the DOJ's decision to award the grant.

Next, Williams has alleged that compliance is an express condition of payment. First Am. Compl. ¶¶ 30, 40, 41, 53, 57-58. According to Williams, the DOJ—as articulated in its Assurances form—requires its applicants and grantees to promise that they will not engage in future discrimination and that the form traces this requirement to specific federal civil rights laws. Id. ¶ 58. These obligations are underscored in the COPS Program Award Owner's Manual that is distributed to grantees. Id. ¶ 63. Although not "automatically dispositive," the allegation that compliance is an express condition of payment indeed is "relevant." Univ. Health Servs., 136 S. Ct. at 2003.

Similarly, Williams has alleged that, in the Certifications form, the DOJ expressly designates an applicant's representations about its compliance with the legal requirements outlined in the manual and Assurances and Certifications forms as "material representations of fact upon which reliance will be placed when the [DOJ] determines to award the covered grant." First Am. Compl. ¶ 92. Again, while not dispositive, the language within the DOJ's own form— which, having been signed by city officials, now serves as a partial basis for Counts I, II, and III—is relevant in the analysis of materiality. Furthermore, the non-compliance alleged here is neither minor nor insubstantial. To the contrary, Williams has alleged that Defendants have engaged in a longstanding pattern of discriminatory practices—one that spans decades and cannot reduced to a set of isolated incidents. Id. ¶¶ 93-97.

Applying this holistic approach, the court concludes that Williams adequately has alleged the materiality of Defendants' purportedly false certifications of compliance with Title VI, 42 U.S.C. § 3789d, and their implementing regulations.

Turning to the materiality of Defendants' alleged non-compliance with the non-supplanting requirements, Williams does not identify the statutes that underlie those requirements. However, he does allege that the Government has with some frequency barred law enforcement agencies from receiving COPS grants because those agencies engaged in conduct that arguably violates the non-supplanting requirements. Id. ¶ 78. This allegation is sufficient to raise a reasonable inference that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" with the non-supplanting requirements. Universal Health Servs., 136 S. Ct. at 2003. Accordingly, Williams adequately has alleged that compliance with those requirements is material to the Government's decision to pay.

Williams further alleges that the Brockton Police Department has failed to comply with the non-supplanting rules. Specifically, Williams alleges that the non-supplanting rules mandate that COPS recipients maintain the budgeted number of locally funded officer positions after receiving COPS grants, and maintain the required number of additional police officers, First Am. Compl. ¶ 77 [#44], but that the Brockton Police Department cut the number of sworn officer positions, id. ¶ 79. Williams also sufficiently alleges that Defendants represented that they would comply with the non-supplanting requirements by way of the Certifications form which represents that "[t]he applicant will comply with all legal, administrative, and programmatic requirements that govern the applicant for acceptance and use of Federal funds as outlined in the . . . COPS Grant Owner's Manual . . . and all other applicable program regulations, laws, orders, and circulars." Id. ¶ 92. Accordingly, Williams adequately has alleged that Defendants falsely

certified their compliance with the non-supplanting requirements, and that this certification is material to the government's decision to pay COPS grants.[13] The materiality requirement has been met.

ii.   Scienter

The FCA's scienter requirement demands that an individual act "knowingly" in presenting a false claim or making or using a false record. 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B). The statute defines "knowing" and "knowingly" as having "actual knowledge" of information or acting in "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The purpose of the scienter requirement is to avoid punishing "honest mistakes or incorrect claims submitted through mere negligence." United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 728 (4th Cir. 2010) (citation internal quotation marks omitted).

Defendants appear to argue that the Amended Complaint does not demonstrate that Defendants knew that their certifications were false before July 2009, because none of the civil rights complaints identified in the Amended Complaint were filed until after November 2009. However, the complaint only must demonstrate that Defendants knew or should have known that their certification that they were in compliance with the non-discrimination regulations cited

---

[13] The Amended Complaint identifies at least three other grants that Defendants received from DOJ outside of the COPS program. See First Am. Compl. ¶ 72. While the Amended Complaint alleges that those grant programs require compliance with non-discrimination laws and regulations, Williams does not allege that the non-supplanting rules apply to those non-COPS grant programs, nor that Defendants certified compliance with any such rules. See id. ¶ 9 (alleging that "[t]he false statements and claims described herein, which flow from Defendants' violations of civil rights laws, are based on Defendants' fraudulent and false certifications of compliance with Federal civil rights laws in applications for Federal grants, including those applications and grants related to [DOJ's COPS] program and the Justice Assistance Grant ("JAG") Program.") see also id. ¶¶ 30, 33. Accordingly, Williams has not alleged any materially false representation in connection with the Government's decision to pay any non-COPS grants.

above was false at the time it was made, not that they knew that particular residents had accused them of misconduct. Williams alleges that, notwithstanding the fact that the identified civil rights actions were not publicly filed until 2009, Defendants knew or should have known that their language access and employment practices had discriminatory effects on residents and employees on the basis of national origin and race and indeed they were designed for that purpose. With respect to the non-supplanting requirements, Williams' allegations that the Brockton Police Department intentionally reduced the number of sworn officer positions, First Am. Compl. ¶ 79, are sufficient to state a claim that Defendants knew or should have known that their representations that they would not do so were false. Accordingly, Williams has satisfied the scienter requirement and, in so doing, the falsity requirement.

### iii.  Particularity

Defendants argue that the Amended Complaint fails to allege fraud with sufficient particularity. Causes of action under the 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(C) are subject to the heightened Rule 9(b) pleading standard for allegations of fraud. See United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009). In the FCA context, Rule 9(b) requires an FCA relator to "provide details that identify particular false claims for payment that were submitted to the government." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004) (recognized as abrogated on other grounds in Lawton ex rel. United States v. Takeda Pharm. Co., 842 F.3d 125 (1st Cir. 2016)). A complaint that provides some details as to the dates of claims, the identification numbers for claims, the contents of forms or bills submitted, the amount of money charged, the particular goods or services for which the government was billed, and the individuals involved in the billing "may help a relator to state his or her claims with particularity." Id. at 233. While not all of this

information need be provided, "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." Id. (citation omitted). The First Circuit has described this as an expectation that the pleader will specify "the who, what, where, and when of the allegedly false representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

Williams alleges that, on May 25, 2011, Brockton Mayor Balzotti and Brockton Police Chief Conlon signed, and Brockton grant coordinator Michele Streitmater submitted, certifications stating that "the applicant will comply with all legal, administrative, and programmatic requirements that govern the application for acceptance and use of federal funds." First Am. Compl. ¶ 92. Williams further identifies specific COPS grants received in 2003, 2008, 2009 and 2011 by the amount of payment received, and in some cases the grant number and specific date of payment Id. ¶¶ 68-71. Thus, Williams has identified several claims for payment with sufficient particularity.

Defendants nevertheless contend that Williams' allegations regarding Defendants' non-compliance are inadequate under Rule 9(b) because they do not articulate "names, dates, specific allegations of misconduct, etc. concerning minority citizens"; "the names of the officers who were forced into retirement or unlawfully terminated, the dates and times of said transactions, the names of the officers who were hired to supplant the disciplined officers etc."; and "the names, dates, incidents, etc." of African-American officers who experienced unlawful discrimination in employment. Defs.' Mem. Law Supp. Mot. Dismiss 7 [#46]. These details are not necessary, at the pleading stage, to adequately allege that Defendants failed to comply with federal civil rights laws and the non-supplanting rules. Accordingly, Williams has met the Rule 9(b) standard for pleading fraud with particularity.

*b.   Statute of Limitations*

Defendants argue that any claims based on transactions prior to November 27, 2006, are

barred by the FCA's six-year statute of limitations. The FCA's statute of limitations provision

reads:

> A civil action under section 3730 may not be brought—
>
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b). Some courts have construed subsection (2) (the ten year period) to apply

only to actions brought by the government and subsection (1) (the six year period) to apply to

actions brought by relators. See, e.g., United States ex rel. Sanders v. N. Am. Bus Indus. Inc.,

546 F.3d 288, 293 (4th Cir. 2008). Others have concluded that subsection (2) applies to actions

brought by relators when the government declines to intervene, reasoning that § 3731(b) states

that it applies to "civil action[s] under § 3730" without distinguishing between actions brought

by the government under § 3730(a) or relators under § 3730(b). See, e.g., United States ex rel.

Hyatt v. Northrop Corp., 91 F.3d 1211, 1218 (9th Cir. 1996). A third line of cases holds that the

three-year tolling provision in subsection (2) may apply to actions brought by relators, but that it

does not begin to run until the government knows or should know of the alleged FCA violation.

See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of Am., 474 F. Supp. 2d 75,

89 (D.D.C. 2007) (holding that the statute of limitations runs as follows: "(1) six years from the

date of the violation; or (2) three years from the date when facts material to the right of action are

or should be known to the relevant government official, whichever occurs last; but (3) in no

event more than ten years after the violation is committed")

The last of these interpretations is best supported by the plain language of the statute.
That is, a cause of action for violation of 31 U.S.C. § 3730 may be brought within six years of
the date of the violation *or* within three years of the date the government learns of the violation,
but in no event more than 10 years after the violation has occurred. For the purposes of this
action, there is no allegation that the government official charged with responsibility to act in
these circumstances knew or should have known of the allegations before Williams filed the
initial complaint in this action on November 27, 2012. Accordingly, allegations of FCA
violations occurring from November 27, 2002 forward are timely.

### c.   *Public Disclosure Bar*

Next, Defendants argue that the FCA's "public disclosure bar" deprives the court of
subject matter jurisdiction over Williams' non-retaliation claims. The public disclosure bar
provides that

> [t]he court shall dismiss an action or claim under this section . . . if substantially all or the
> same allegations or transactions as alleged in the action or claim were publicly disclosed
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its
> agent is a party; (ii) in a congressional, Government Accountability Office or other
> Federal report, hearing, audit or investigation; or (iii) from the news media, unless the
> action is brought by the Attorney General or the person bringing the action is an original
> source of the information.

31 U.S.C. § 3730(e)(4)(A). Williams responds that the public disclosure does not apply in this
case but that if it does, Williams qualifies as an "original source."

The court conducts a multi-part inquiry to determine whether the FCA's public disclosure
bar applies, looking at: (1) whether there has been a public disclosure of fraud; (2) whether that
prior disclosure is found in a source specified in the statute; and (3) whether the relator's *qui tam*

action is "substantially similar" to the prior disclosure. [14] <u>United States ex rel. Ondis v. City of Woonsocket</u>, 587 F.3d 49, 53 (1st Cir. 2009). If the answer to any question is "no," then the public disclosure bar does not apply. If all the answer to all three questions is "yes," then the court must determine if the relator qualifies under the statute's "original source" exception at section 3730(e)(4)(B). <u>See</u> <u>United States ex rel. Rost v. Pfizer</u>, 507 F.3d 720, 728 (1st Cir. 2007) (recognized as overruled in part on other grounds in <u>United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.</u>, 750 F.3d 111, 113-14 (1st Cir. 2014)).

Here, the inquiry begins and ends with the third prong, because the *qui tam* action and the prior disclosures are not substantially similar. A relator's allegations are "based upon" the publicly disclosed allegations if they are "substantially similar" to those the public allegations, which is determined by comparing the substance of both sets of allegations. <u>United States ex rel. Poteet v. Bahler Med., Inc.</u>, 619 F.3d 104, 114 (1st Cir. 2010). The "based upon" requirement thus "precludes qui tam actions that merely parrot previously disclosed allegations or transactions." <u>Ondis</u>, 587 F.3d at 58.

Defendants contend that the prior public disclosures that bar this action—which include newspaper articles, website documents, publicly available lists of COPS grant recipients, the City of Brockton's financial audit that concluded that it had complied with federal grant requirements, and court documents relating to the civil rights actions discussed in the Amended Complaint—taken together, disclose to the public that a) Defendants received COPS grants in at least 2009 and 2011; b) Defendants have been sued several times for civil rights violations, and

---

[14] Prior to the 2010 amendments, the public disclosure bar applied where allegations of fraud were "based upon" the public allegations, which the First Circuit construed to require that the two allegations be "substantially similar." <u>Ondis</u>, 587 F.3d at 58. The amended FCA now states that the public disclosure bar applies if the two sets of allegations are "substantially the same," according with the First Circuit's construction of the prior language.

none of the lawsuits resulted in a verdict for a plaintiff; and c) Defendants hired a small number

of minority officers in 2007. Defs. Mem. Supp. 1st Mot. Dismiss Pl.'s Compl. [#28]; Defs.' First

Mot. Dismiss 7-8 [#46]; Exs. A-E [#28-1 to #28-5] (incorporated by reference into Defendants'

present motion to dismiss). Williams, on the other hand, alleges that the Brockton Police

Department specifically targeted minority community members on the basis of race for civil

rights violations, engaged in discriminatory employment practices by assigning African-

American officers to less desirable and more dangerous posts, and discriminated against minority

community members on the basis of national origin by requiring them to file complaints in

English. His allegations are not limited to those disclosed in the prior civil rights actions and

newspaper articles, because he also presents new allegations not previously brought to light. His

allegations therefore are significantly different in scope and kind from the prior publicly

disclosed information. Due to a lack of substantial similarity between the two sets of allegations,

the public disclosure bar does not apply in this case.

   2. <u>Count IV</u>

   Finally, Williams asserts a fourth cause of action under 31 U.S.C. § 3730(h) for

retaliation. The FCA's anti-retaliation provision prohibits an employer from taking adverse

actions against any employee "because of lawful acts done by the employee . . . in furtherance of

an action under [31 U.S.C. § 3730] or other efforts to stop 1 or more violations of [the FCA]." 31

U.S.C. § 3730(h)(1). To state a claim for retaliation under the FCA, "a plaintiff must demonstrate

that he or she engaged in activity protected under the FCA." <u>Karvelas</u>, 360 F.3d at 236. In

addition, the employer must know that "the plaintiff is engaged in protected conduct, that is,

investigation or other activity concerning false or fraudulent claims that the employer knowingly

presented to the federal government." <u>Id.</u> at 239.

Williams' retaliation cause of action asserts that Williams was employed by the Brockton Police Department "until he began raising complaints in or around 2005 regarding unlawful police activity with his co-workers and supervisors, and refused to cooperate in the Brockton Police Department's concerted efforts to protect the institution  and the false representations to the public that had masked what Relator Williams knew was the truth concerning Defendants' pattern and practice of Title VI violations." First Am. Compl. ¶ 218. Thus, Williams alleges that he was retaliated against for speaking out about discrimination and about misrepresentations made *to the public* regarding Defendants' violations of civil rights laws, but not for taking any action with respect to misrepresentations being made to the Government. Indeed, Williams' complaint nowhere alleges that he was engaged in any FCA-protected activity, such as investigating what he believed to be false claims presented to the Government. While Williams alleges numerous facts from which it could be inferred that he refused to cooperate with what he perceived to be a pattern and practice of discrimination, that refusal is not conduct protected by the FCA's anti-retaliation provisions. Accordingly, Williams fails to state a cause of action for retaliation under the FCA.

II.    Conclusion

For the foregoing reasons, on reconsideration Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [#45] is ALLOWED as to Count IV and DENIED as to Counts I, II, and III.

IT IS SO ORDERED.

Date: December 23, 2016                                    /s/ Indira Talwani
                                                          United States District Judge