UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | * | |
| KEN E. WILLIAMS, | * | |
| | * | |
| Plaintiff-Relator, | * | |
| | * | |
| v. | * | Civil Action No. 1:12-cv-12193-IT |
| | * | |
| CITY OF BROCKTON, CITY OF | * | |
| BROCKTON POLICE DEPARTMENT, | * | |
| DOES 1-100, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

February 24, 2020

TALWANI, D.J.

Plaintiff-Relator Ken Williams ("Relator"), a former City of Brockton police officer,

brought this *qui tam* action against Defendants Brockton Police Department ("BPD") and the

City of Brockton under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, 3730. Relator

alleges that Defendants violated the FCA by applying for and accepting federal Community

Oriented Policing Services ("COPS") grants while falsely certifying the BPD's intent to comply,

and subsequent compliance, with various grant requirements, including Title VI, federal non-

discriminatory law enforcement practices, and other statutory, regulatory and contractual

provisions. Am. Compl. ¶ 10 [#44].

Pending before the court is Defendants' Motion for Summary Judgment [#122]. Although

the allegations of non-compliance with government grants, particularly as related to issues of

community policing, are of concern, on the record presented, Relator has not shown that a

reasonable jury could find in his favor on the *qui tam* complaint. Accordingly, and for the

reasons set forth below, Defendants' Motion for Summary Judgment [#122] is GRANTED.

I.      FACTUAL BACKGROUND

For the purposes of summary judgment, the court takes the following facts in the light

most favorable to Relator, the non-moving party.

A.      Relator's Employment at BPD

Relator was a police officer at the BPD from October 30, 1995, to November 12, 2010.

Am. Compl. ¶ 15 [#44]; Answer ¶ 15 [#82].

B.      COPS Grants

COPS grants are administered by the Department of Justice ("DOJ") and provide federal

funds to law enforcement to "reorient the mission and activities of law enforcement agencies

through initiating community policing or enhancing [law enforcement agencies'] involvement in

community policing." Defendants' Statement of Material Facts ("Defs.' Facts"), Ex. 3 ("2011

COPS Application") at 10 [#124-3].

The City of Brockton ("Brockton") and the BPD applied for COPS grants on April 13,

2009, and May 25, 2011. 2009 COPS Application [#124-4]; 2011 COPS Application [#124-3].

The applications sought funds to facilitate the hiring or rehiring of officers and to obtain

assistance in implementing BPD programs that were under-resourced. See 2009 COPS

Application 9-13 [#124-4]; 2011 COPS Application 29 [#124-3]. During the relevant period,

BPD's Grant Coordinator was Michele Thibeault. Defs.' Facts ¶ 12 [#124]; Relator's Statement

of Material Facts ("Relator's Facts") ¶ 12 [#125].[1] As grant coordinator, Ms. Thibeault's

responsibilities included "everything from researching grant opportunities to locating and

---

[1] Both grant applications are signed by "Michele Streitmater." See 2011 COPS Application 49
[#124-3]; 2009 COPS Application 30 [#124-4]. At the hearing on the motion for summary
judgment, the parties stipulated that Michele Streitmater and Michele Thibeault are the same
person.

identifying potential funders, . . . fill[ing] out the application, provid[ing] all the documentation that is required, [and] submit[ting the application]." Defs.' Facts, Ex. 7 ("Thibeault Dep.") 25:17-26:21 [#124-7]. Ms. Thibeault's department was also "responsible for the implementation of the grant." Id. [#124-7].

Both grant applications were also signed by former Chief of Police William Conlon and the Mayor at the time the application was submitted. Defs.' Facts ¶¶ 4-5 [#124]; Relator's Facts ¶¶ 4-5 [#125] (the 2009 grant was signed by former Mayor James Harrington, and the 2011 grant was signed by former Mayor Linda Balzotti). In signing the grant applications, Thibeault, Conlon, Harrington, and Balzotti each certified that the assurances made therein were true and accurate to the best of his or her knowledge, and that each signatory understood and would comply "with all [governing] legal and administrative requirements . . . ." Defs.' Facts ¶¶ 4-5 [#124]; Relator's Facts ¶¶ 4-6 [#125]; 2009 COPS Application 24, 30-31 [#124-4]; 2011 COPS Application 42, 49-50 [#124-3].

The grants required certification that participants would, "in compliance with applicable law, seek, recruit and hire qualified members of racial and ethnic minority groups and qualified women," and would not "on the ground of race, religion, national origin, gender, disability or age, unlawfully exclude any person from participation in, deny the benefits of or employment to any person, or subject any person to discrimination in connection with any programs or activities funded in whole or in part with federal funds." 2011 COPS Application 42 [#124-3]; 2009 COPS Application 24 [#124-4].

Defendants also certified that "under Title VI of the Civil Rights Act of 1964, [they would] ensure meaningful access to [their] programs and activities by persons with limited

English proficiency." 2011 COPS Application 42 [#124-3]; 2009 COPS Application 24 [#124-4]. Specifically, the grants required that:

> as a condition of receipt of federal financial assistance, you acknowledge and agree that you will not . . . on the ground of race, color, religion, national origin (which includes providing limited-English proficient persons meaningful access to your programs) . . . unlawfully exclude any person from participation in, deny the benefits of, or employment to any person, or subject any person to discrimination in connection with any programs or activities funded in whole or in part with federal funds.

Relator's Facts, Ex. G ("Grant Manual") 17 [#125-7].

The 2009 and 2011 grants also included "nonsupplanting" requirements which mandated that grant funds could only be used to increase a grantee's law enforcement budget, and would not be used to replace local funds that the grantee would have otherwise spent on officer positions absent the grant. 2011 COPS Application 43 [#124-3]; 2009 COPS Application 18, 25 [#124-4]. The COPS grants mandated that "[i]n the event that any court or administrative agency makes a finding of discrimination on grounds of race, color, religion, national origin, gender, disability or age against the applicant after a due process hearing," applicants must forward a copy of the finding to the Office for Civil Rights at DOJ. 2009 COPS Application 24 [#124-4]; 2011 COPS Application 42 [#124-3]. Applicants were required to agree that they "may be audited or monitored to ensure that [they are] initiating or enhancing community policing." 2011 COPS Application 10 [#124-3]. See also 2009 COPS Application 13 [#124-4].

BPD was awarded a COPS Hiring Recovery Program (CHRP) Grant on July 23, 2009 (#2009RKWX0401) and another CHRP Grant on September 30, 2011 (#2011UMWX0074). Defs.' Facts ¶¶ 2-3 [#124]; Defs.' Ex. 5 ("Sep. 30, 2011 Grant Award Letter") [#124-5]; Defs.' Ex. 6 ("July 28, 2009 Grant Award Letter") [#124-6]; Relator's Facts ¶¶ 2-3 [#125]. The 2009 and 2011 grant awards were intended to provide funding to BPD to hire law enforcement officers

for the "advancement of public safety through an increase in their community policing capacity and crime prevention efforts." Relator's Facts ¶¶ 7-8 [#125]; Sep. 30, 2011 Grant Award Letter [#124-5]; July 28, 2009 Grant Award Letter [#124-6]. Among other substantive reporting requirements, Defendants were required to submit "quarterly financial and programmatic progress reports . . . ." July 28, 2009 Grant Award Letter [#124-6]; Relator's Facts ¶¶ 7-8 [#125]. The July 28, 2009 Grant Award letter noted that "each CHRP application was subject to a thorough review, and some of [the] application information may have been updated or corrected from the original version submitted to COPS." July 28, 2009 Grant Award Letter [#124-6]. The letter also noted that BPD and Brockton should revise their community policing plan if it "significantly changed" from the plan outlined in the application, and that "[s]imilarly, [Defendants] should contact the COPS Office if, for any reason, [they] need to reallocate [] awarded positions . . . ." Id.

     C.      Defendants' Alleged Non-Compliance with COPS Grant Requirements

          1.     *Findings of Discrimination*

In January 2009, the Brockton City Solicitor found that Sergeant Lon Elliott of BPD had engaged in racially discriminatory conduct during an arrest. Relator's Facts ¶ 9, Ex. A ("City Solicitor Findings") [#125-1]. BPD never forwarded a copy of this finding to DOJ. Relator's Facts ¶ 9, Relator Decl. ¶ 23 [#125-2].[2]

The record contains no findings by a court or administrative agency that BPD either violated Title VI or engaged in other discriminatory conduct that would violate the assurances made in the COPS grant applications. Defs.' Facts ¶¶ 9-10 [#124]; Relator's Facts ¶¶ 9-10

---

[2] As discussed below, the parties dispute whether this finding should have been reported. Defendants do not dispute Relator's fact that the finding was not reported.

[#125]. No plaintiff has secured a court verdict against BPD for discrimination. Defs.' Facts ¶ 11 [#124]; Relator Decl. ¶ 8 [#125-2].

      2.    *Hiring Discrimination in Violation of Title VI and Other Grant Requirements*

In the process of selecting and hiring job applicants, BPD draws from a "civil service list" that identifies "eligible applicants" who have taken a Civil Service exam. Thibeault Dep. 86:13-20 [#124-7]. Relator asserts that although applicants are initially "ranked by objective criteria," BPD then hires from that list in an "arbitrary process that prioritizes nepotism and penalizes members of racial and ethnic minority groups and women." Relator Decl. ¶ 8 [#125-2]. Thibeault testified that after receiving the 2009 COPS Grant, BPD hired twelve employees, after requesting a list of candidates from this civil service list. Thibeault Dep. 38:5-40:16 [#124-7].

      3.    *Failure to Ensure Meaningful Access for People with Limited English Proficiency*

At BPD, translators are available to assist individuals with limited English proficiency when such individuals come in to make a complaint, but translators do not generally assist in post-complaint investigations. Relator's Facts, Ex. D ("Teixeira Dep.") at 51:15-19 [#125-4]; Relator's Facts, Ex. E ("Leary Dep.") 54:22-56:2; 58:12-58:19 [#125-5].

At some point after receiving the grants, Thibeault created a program of volunteer translators. Thibeault Dep. 91:10-17 [#124-7]. Thibeault conceded that she did not think access to these volunteers was sufficient to provide access to individuals with limited English proficiency, but stated that she felt that it was "a start." Id. at 97:14-98:4 [#124-7]. Thibeault also testified that an attorney from DOJ had told her that "an effort like this would assure that Brockton was in compliance by making a meaningful step towards assisting its community with language translation." Id. at 98:8-17 [#124-7].

4.     *Violation of Non-Supplanting Requirements*

In April 2012, DOJ launched an audit into BPD's compliance with the "regulations,

terms and conditions" of the 2009 COPS Grant. Relator's Facts ¶ 14 [#125]; Defs.' Facts ¶ 14

[#124]; Defs.' Ex. 2 (April 25, 2012, Letter re: Grant Monitoring) [#124-2]. Following the audit,

which included an on-site visit, DOJ identified a "compliance issue for supplanting by reduction

in force," and requested additional documentation regarding this issue. Defs.' Facts, Ex. 8 (July

23, 2012 Letter from DOJ COPS to Chief of Police Emanuel Gomes) 1 [#124-8]; Defs.' Facts,

Ex. 9 (July 23, 2012 Reduction in Force Review) [#124-9]; Relator's Facts ¶ 16 [#125]. After

Brockton and BPD provided additional information to DOJ investigators, DOJ "determined that

the reduction-in-force does not violate the nonsupplanting requirement based on the fact that the

[BPD] demonstrated that the reduction-in-force occurred for reasons unrelated to the receipts of

COPS grant funding." Defs.' Facts, Ex. 10 (August 17, 2012, Reduction-in-Force Review –

Notice of Compliance) [#124-10]; Relator's Facts ¶ 18 [#125].

5.     *Discrimination in Policing Practices*

Relator states that he has witnessed a pattern of discrimination within BPD and towards

community members both before and after 2002, including the withholding of adequate medical

care from injured minority prisoners and surveillance of community members. Relator Decl.

¶¶ 16-23 [#125-2]. See also Teixeira Dep. 34:12-39:8 (testifying to civil rights complaints made

in 2004) [#125-4].

II.     PROCEDURAL HISTORY

In November 2012, Relator filed his *qui tam* complaint under the federal FCA against the

City and BPD, and 100 unnamed "John Doe" co-conspirators. Compl. [#1]. The government

declined to intervene on August 28, 2014. See Notice of Election to Decline Intervention [#19].

Relator filed the operative Amended Complaint [#44] in October 2015. On Defendants' Motion

to Dismiss [#45], the court dismissed Count IV (Relator's retaliation claim) but allowed Counts I to III to proceed.[3] Count I asserts a claim for presentment, under 31 U.S.C. § 3729(a)(1)(A). Am. Compl. ¶¶ 201-04 [#44]. Count II alleges that Defendants made statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Id. ¶¶ 205-08 [#44]. Finally, Count III asserts that Defendants conspired to violate the FCA. Id. ¶¶ 209-15 [#44]. After discovery closed, Defendants moved for summary judgment on the remaining counts. Defs.' Mot. for Summ. J. [#122].

III.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A fact is material if it "has the potential of determining the outcome of the litigation." Id.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court "give[s] no heed to speculative, unsupported, or unreasonable conclusions." Showtime Entm't, LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014).

---

[3] The court initially allowed Counts I-III to proceed only with respect to allegations of nonsupplanting provision violations, Mem. & Order, issued August 5, 2016 [#59], but upon reconsideration, allowed Counts I-III to proceed without limiting the claims. Mem. & Order, December 23, 2016 [#76].

IV.     DISCUSSION

The FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). "[A]t the summary judgment stage, relators must produce competent evidence of an actual false claim made to the government." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 58 (1st Cir. 2017). "False or fraudulent claims" include "misrepresentations by omission," as well as "half-truths . . . that state the truth only so far as it goes, while omitting crucial qualifying information." Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 1999-2000 (2016).

"Although the archetypal *qui tam* FCA action is brought by a whistleblower employee who discovers that her private corporate employer has overcharged under a government contract, FCA claims have proceeded under numerous theories, including cases . . . alleg[ing] false certifications of compliance and violations of federal grant requirements." United States ex rel. Lamers v. City of Green Bay, 998 F. Supp. 971, 985 (E.D. Wis. 1998) (citing U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996)).While the First Circuit has not explicitly discussed the theory of fraud in the inducement, or promissory fraud, courts outside of the First Circuit have held that "[a]lthough promissory fraud may be actionable in rare circumstances under the FCA, the promise must be false when made." U.S. ex rel. Hopper, 91 F.3d at 1267 (citing U.S. v. Shah, 44 F.3d 285, 290 (5th Cir. 1995)).

"FCA liability . . . is [also] circumscribed by 'strict enforcement of the Act's materiality and scienter requirements.'" United States ex rel. Jones v. Brigham and Women's Hosp., 678 F.3d 72, 85 (1st Cir. 2012) (citation omitted). "The Act's scienter requirement defines knowing and knowingly to mean that a person has actual knowledge of the information, acts in deliberate

ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information." Universal Health, 136 S. Ct. at 1996 (internal quotation marks omitted). Materiality is a "demanding" standard that considers the "effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002-03.

A.     Counts I & II (Submission of Claims or Statements Material to Payment of Claims)

Relator asserts two grounds for liability under Counts I and II. First, Relator contends that the 2009 and 2011 grant applications contain false statements and that these statements are actionable under the FCA because the statements were made knowingly, and were material to DOJ's decision to award grants.

Second, Relator alleges that Defendants submitted false claims to the government by submitting quarterly certifications of compliance with grant requirements despite their alleged failure to comply with those requirements.

1.     *Liability Based on Representations Made in Grant Applications*

Relator asserts that Defendants' statements (made at the time of submission) that they intended to comply with the requirements of the grant are actionable because they were false as Defendants had no such intent, material to payments, and made the statements knowingly or in reckless disregard of their falsity. Relator asserts that Defendants made additional false statements on the 2011 grant application by falsely listing individuals as employed at BPD who were not actually employed at the time.

a.     *Certification of Intent to Comply with Grant Requirements*

Defendants argue that FCA claims "predicated on an intent to comply in the future" cannot survive summary judgment. Defs.' Reply to Pl.'s Suppl. Br. [#148]. At the hearing, Relator agreed that a statement on a grant application, if true when made, could not give rise to

liability under the False Claims Act, but asserted that there is legal precedent for the proposition that grant applications containing false statements may be actionable.[4]

The court does not need to determine whether Relator's legal theory is plausible, because Relator has failed to proffer evidence to support Relator's assertion that Defendants' statements in the 2009 or 2011 grant applications about their intent to comply with those grants' conditions were false when made. See Lamers, 998 F. Supp. at 987 (explaining that relator "has to show that the City's promises, or [certifications], were known to be false at the moment they were made—that [Defendants] never had any intention of complying"). Although Relator argues that Defendants' subsequent non-compliance bears on the truth of their promise to comply, whether Defendants subsequently carried out the goals and regulations of the COPS program is distinct from whether Defendants *intended* to comply when they made the statements.

Where the factual question relates to an issue of fraudulent intent, the question of falsity and scienter are closely entwined. See United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) ("[I]t is impossible to meaningfully discuss falsity without implicating the knowledge [scienter] requirement."). Even if Relator could show that Defendants' promise of future compliance was false at the time of the grant applications, there is insufficient evidence for a reasonable jury to conclude that Defendants knowingly and

---

[4] Although Relator argues that U.S. ex. rel. Westmoreland v. Amgen, Inc., 707 F.Supp.2d 123 (D. Mass. 2010), rev'd in part by New York v. Amgen, 652 F.3d 103 (1st Cir. 2011) offers persuasive support for his claim, the posture and facts of that case are inapposite. The relator in Westmoreland, facing a motion to dismiss, argued that Medicare Enrollment Forms, which contained prospective certifications that the provider would comply with Medicare laws, qualified as express certifications under the FCA. Although "[t]here is no reason why such an explicit certification of future compliance cannot be the basis of False Claims Act liability if the provider makes such a certification knowing that it will violate the statute, and later submits claims which are not in compliance with the statute," the court declined to rule on whether the certifications themselves constituted false claims, because the relator had not "alleged that providers expressly made such statements knowing their falsity." 707 F.Supp.2d at 135-136.

intentionally made any such false representations, and Relator has not presented facts to dispute

that assertion. Nor has Relator proffered evidence of reckless disregard of the significance of

signing the grant applications. On the contrary, testimony from Thibeault evinces Defendants'

intent to comply with requirements when signing the applications. Thibeault "understood those

signatures [on the grant applications] to mean" that Defendants "would abide by all the

conditions in the grant." Thibeault Dep. 51:23-52:2 [#124-7]. Thibeault also testified to her

general practice of communicating about grants with the Mayor or BPD Chief prior to signing

the applications, see id. at 53:2-13, reducing the likelihood that these applications could have

been signed with reckless disregard as to the significance of her certifications.

Because Relator has failed to present evidence from which a reasonable jury could find

that Defendants made a knowingly false statement when they certified their intent to comply

with grant requirements, Relator's claim with respect to statements of intent to comply on the

2009 and 2011 grant applications fails.

b. *False Employment Information on 2011 Grant Application*

Relator asserts that Defendants made false statements on the 2011 Grant Application by

listing the names of police officers who were "no longer on the active payroll in the [2011]

COPS grant application that was submitted to the federal government." Relator Decl. ¶¶ 14-15

[#125-2].[5] Relator further alleges that "Defendants in the [2011] COPS CHRP grant reduced the

baseline [of officers] to 176" from a 2009 baseline of 187. Id. Relator identifies several officers

whom he states Defendants listed as employed at BPD on the 2011 grant application, but who

---

[5] While Relator's declaration refers to a 2010 grant application, Relator's counsel asserted at the
December 13, 2019 continued hearing on the motion for summary judgment that this is a
typographical error, that there was no 2010 application, and that Relator was referring to the
2011 grant application.

were not in fact, employed at that time. Id. ¶15. However, the 2011 grant application does not reflect any names of specific officers listed, nor is that information requested. Instead, the application states that 186 officers were employed, without listing specific officers' names.

Relator's affidavit, based on personal knowledge, is the only source of evidence in the record as to the misrepresentations of officers on payroll. However, Relator was terminated from BPD in November 2010, and Defendants applied for the 2011 COPS grant in May 2011. Am. Compl. ¶ 15 [#44]. Relator does not provide any explanation for why he would have knowledge of the grant application after having left BPD. In the absence of such an explanation or another source of evidence, there is insufficient evidence in the record from which a jury could find that Defendants falsely represented on the 2011 grant application that certain police officers were working at BPD when they were not.[6]

2.      *FCA Liability Based on Submission of Progress Report*

Aside from the grant applications, Relator asserts that Defendants submitted false claims in the form of progress reports certifying compliance with grant requirements. Although Defendants were required to submit such reports quarterly, only one report, covering the time period of April 1, 2013, through June 30, 2013, is in the record. See Realtor's Suppl. Statement of Undisputed Material Facts ("Realtor's Suppl. Facts") ¶ 13 [#137-1]; Relator's Suppl. Facts, Ex. K-2 COPS Progress Report, Reporting Quarter: 4/1/2013-6/30/2013 ("2013 Progress Report") [#139]. Relator states that the 2013 Progress Report constitutes a false claim because it

---

[6] At a second hearing on the summary judgment motion, Relator's counsel asserted that he provided additional evidence in his Supplemental Memorandum in Opposition of Motion for Summary Judgment ("Supplemental Opposition") [#137]. The court struck this supplemental material prior to that hearing, however, as filed without first seeking leave of court. See Elec. Order [#147].

contains Thibeault's explicit certification of compliance with programmatic grant requirements during the reporting period, despite Defendants' non-compliance with several grant requirements during the reporting period. 2013 Progress Report [#139]. The court discusses each alleged misrepresentation in turn.

*a.      Adverse Administrative Findings*

Relator argues that Defendants' failure to report in their progress reports the City Solicitor's finding that Sergeant Elliott had acting discriminatorily during a traffic stop rendered false Defendants' certification of compliance with reporting provision of the grants. Relator's Facts ¶ 9, Relator Decl. ¶ 23 [#125-2]; Relator's Ex. A ("Report of Hearing Officer") 1 [#125-1]. The COPS grants mandated that "[i]n the event that any court or administrative agency makes a finding of discrimination on grounds of race, color, religion, national origin, gender, disability or age against the applicant after a due process hearing," applicants must forward a copy of the finding to the Office for Civil Rights at DOJ. 2009 COPS Application 24 [#124-4]; 2011 COPS Application 42 [#124-3]. Relator has failed to show that a City Solicitor's finding amounts to a finding by a court or administrative agency. And even if that determination could be considered such a finding, it was released in January 2009, at least three months prior to Defendants' 2009 grant application, see Report of Hearing Officer 1 [#125-1] (dated Jan. 29); 2009 COPS Application 24 [#124-4] (dated Apr. 14). Relator alleges no other adverse administrative finding during the relevant reporting period. Thus, no reasonable jury could find that Defendants falsified their 2013 quarterly report by failing to report a finding by a City Solicitor that occurred prior to the relevant reporting period.

b.      *Non-Supplanting Violations*

Relator argues that Defendants violated the nonsupplanting provisions of the COPS Grant and failed to report that violation in the progress reports. Relator's Facts ¶ 2 [#125]. However, the record does not reflect evidence of non-supplanting violations during the 2013 Reporting Period, nor do the parties assert that any non-supplanting violations occurred during that period.

c.      *Recruitment of Qualified Racial and Ethnic Minorities and Women*

Relator alleges that Defendants failed to "seek, recruit and hire qualified members of racial and ethnic minority groups and qualified women" as required by the 2011 and 2009 grant applications, but falsely certified to having complied with this requirement in the 2013 Progress Report. 2011 COPS Application 42 [#124-3]; 2009 COPS Application 24 [#124-4]. Additionally, Relator asserts that Defendants falsely certified that they were complying with non-discriminatory hiring practices when they certified that they would "seek, recruit, hire qualified members of racial and ethnic minority groups and qualified women." Relator's Facts ¶ 3 [#125].

Relator has not provided any information or data from which a jury could find that hiring at the BPD was not consistent with the goals of the COPS program.  Relator asserts that Defendants hired candidates from a civil service list through an "arbitrary process that prioritizes nepotism and penalizes members of racial and ethnic minority groups and women." Relator Decl. ¶ 8 [#125-2]. Relator provided no information, however, about the racial, ethnic, or gender makeup of the police force or the civil service list, relying instead on his declaration that selection from a civil service list was done in a discriminatory manner, or least not a manner that would support the recruitment of minority candidates. Apart from Relator's assertions, the record

does not reflect any evidence from which a jury could infer that BPD hired from the civil service list in a manner that did not affirmatively seek to hire ethnic and racial minorities and women.

"[D]eclarants must do more than simply claim a fact to be true," as the "purpose of summary judgment 'is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.'" United States v. Pfizer, Inc., 188 F.Supp.3d 122, 130 (D. Mass. 2016) (citing Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 (1st Cir. 1998)). Relator's statements are insufficient to create a material dispute of fact or to rebut Defendants' assertion that there is an absence of evidence on this issue of the alleged falsity of Defendants' certifications regarding their hiring practices.[7]

### d.   *Meaningful Access to Persons with Limited English Proficiency*

Relator also claims that Defendants failed to provide adequate translation services despite a grant provision requiring BPD to provide "meaningful access to its programs and activities by persons with limited English proficiency." 2011 Grant Application 42 [#124-3]. At most, however, the evidence in the record reflects that, prior to 2004, BPD did not endeavor to ensure translation services to individuals with limited English proficiency in post-complaint investigations, and that prior to 2010, Defendants forced such complainants to submit written complaints in English or denied such individuals access to translators. See Teixeira Dep. 51:15-19 [#125-4]; Relator Decl. ¶¶ 5, 21 [#125-2]; see also Leary Dep. 34:1-2; 55:11-56:2 [#125-5] (testifying that, before and until 2009 when he worked in internal affairs, he was not aware of translators who assisted non-English speaking complainants throughout the investigation process

---

[7] Furthermore, even if Relator could provide additional context about hiring practices, the court notes that Relator's personal exposure to hiring practice is limited, as his tenure at BPD ended in 2010, well before the 2013 reporting period at issue.

after the initial filing of a complaint). These are serious allegations. But they do not provide evidence from which a jury could infer that after seeking and receiving grants intended to improve community policing, Defendants continued to engage in such practices.

> e.    *Discrimination in Policing Practices*

Relator contends that Defendants falsely certified that they were not engaged in discriminatory policing practices. Again, the evidence proffered comes from Relator's personal experience witnessing discrimination, between 2002 and 2010, and testimony of community members such as Bishop Teixeira. The court does not discount the experiences of Relator and Bishop Teixeira. However, the court finds that no reasonable jury could conclude that Relator and Bishop Teixeira's experiences, both of which occurred before 2013, are sufficient to conclude Defendants were actively discriminating during the reporting period at issue.[8]

---

[8] Relator also submitted financial forms SF-425. See Relator's Suppl. Facts, Exs. K-3 [#139-2], K-4 [#139-3]. Relator asserts that the forms constitute false claims, because during the periods for which they are submitted, Defendants did not comply with explicit and implied programmatic grant requirements for which they certified compliance upon submitting these forms. The documents appear to be financial forms for the reporting period ending March 31, 2013 (Ex. K-3) and the reporting period ending September 30, 2013 (Ex. K-4). Although the forms contain information about federal expenditures signed by Thibeault, with a certification that the information submitted is true, Relator did not submit any affidavit or other authentication identifying or explaining the forms. If offered in their current form, the documents would not be admissible at trial. See generally Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998) (summary judgment cannot be defeated by pointing to evidence that would be inadmissible at trial). Assuming Relator could authenticate and identify these documents for a jury, Relator's claims predicated on these forms nonetheless fail for the same reasons as his claims relating to the 2013 Progress Reports. There is insufficient evidence from which a jury could infer that Defendants, by submitting these forms, were knowingly or with reckless disregard falsely certifying their compliance with programmatic grant requirements during the relevant reporting periods.

3.      *Scienter*

Even if Relator could show that Defendants violated the FCA by falsely certifying that they were in compliance with the grant requirements, Relator would also need to show that Defendants made such certification with the required scienter. To satisfy the element of scienter, a relator need not show any "proof of specific intent to defraud,"  Brigham & Women's Hosp., 678 F.3d at 82, but may show that the person acts "knowingly" if he or she "(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

Relator asserts that Thibeault, as grant administrator, "did not take any affirmative steps to ensure" that the City was meeting its goals but rather, "merely assumed that Defendants were in compliance with its grant obligations before making such certifications and assurances to the government." Relator's Facts ¶ 7 [#125]. The only evidence supporting Relator's assertion is deposition testimony from Thibeault that "unless told otherwise there's any reason to believe that we're not doing this, then my assumption is we are compliant." Thibeault Dep. 61:20-22 [#124-7]. Defendants correctly note that this citation mischaracterizes Thibeault's testimony, as she later states that she checked in with the BPD Chief's Office through the course of the grant to ensure compliance. Thibeault Dep. 62:9-15 [#124-7]; Defs.' Resp. to Relator's Suppl. Facts ("Defs.' Suppl. Resp.") 6-7 ¶ 7 [#149]. Thibeault's testimony at most states that, although she generally assumed compliance unless she heard otherwise, she also periodically checked in with the Chief's Office regarding compliance. Thibeault Dep. 62:9-15 [#124-7]. An isolated, equivocal statement like the one in Thibeault's testimony is insufficient evidence from which a

reasonable jury could infer that Defendants knowingly, or with reckless disregard, failed to comply with the grant requirements.

4.   <em>Materiality</em>

Defendants argue that they are also entitled to summary judgment on the grounds that the alleged false statements were not material.

For a misrepresentation about a requirement to be actionable under the FCA, the misrepresentation must be "material to the Government's payment decision." Universal Health, 136 S. Ct. at 2002. A "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." Id. at 2003. The First Circuit has "long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material."  Brigham & Women's Hosp., 678 F.3d at 82 (citing United States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 307 (1st Cir. 2010)). "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Universal Health, 136 S. Ct. at 2003.

Relator asserts that "the government expressly conditioned payment under the COPS grants on compliance with the nondiscrimination, non-supplanting, and hiring requirements articulated" in the grant application. Relator's Facts ¶ 5 [#125]. In Universal Health, the Supreme Court rejected the concept that the government's decision to "expressly identify a provision as a condition of payment [would be] automatically dispositive." 136 S. Ct. at 2003. Instead, the

19

materiality standard is "demanding," and courts consider the centrality of the provision and any alleged noncompliance before determining that a provision is material. Id. at 1994.

The issues in this case are nuanced. Defendants received a grant to improve community policing, and DOJ conditioned that grant on Defendants' compliance with certain regulatory, legal, and other requirements relating to improved community policing. The record reflects that community policing, and an active intent of the police department to actualize those goals, were critical to the grant's purpose. See, e.g., 2011 Grant Application 10, 42-43 [#124-3] (listing assurances; stating community policing strategy); 2009 Grant Application 13, 24-25 [#124-4] (same). At the same time, evidence in the record also suggests that DOJ did not demand complete success in achieving every goal to completion or at a precise level of detail. For example, the grant submission form allows the submitter to indicate the level of their task completion, such as "plan to examine," "currently being examined," "completed examining," and "no longer intend to examine." See generally 2013 Progress Report [#139].

In light of the grants' purpose of improving community policing, and not simply being a vehicle to supplement local police department budgets, the court finds likely that deliberate falsehoods about steps taken toward such improvements would be found to be material. But because Relator has not presented sufficient evidence from which a reasonable jury could find the alleged statements regarding BPD's efforts were false or made with knowing intent, the court need not finally resolve the materiality issue.[9]

---

[9] The court also does not reach Defendants' further argument that DOJ's audit of BPD's compliance with nonsupplanting provisions in 2012 constitutes a public disclosure that precludes Relator from raising the same violations under the FCA.

B.    Count III (Conspiracy to Violate the False Claims Act)

Count III alleges that "Defendants and Does 1-100 conspired to knowingly submit, or caused to be submitted, false or fraudulent claims, or false records or statements, to the United States to obtain Government grants, and to avoid re-payment or avoid penalties." Am. Compl. ¶¶ 209-15 [#44]. Although liability under the conspiracy prong of the FCA does not require proof of the actual presentment of a claim, it requires proof that a defendant "intended to defraud the government [by getting false claims paid]" and "that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 46 (1st Cir. 2009); see also United States v. President and Fellows of Harvard College, 323 F.Supp.2d 151, 196 (D. Mass. 2004) (holding that evidence of a conspiracy requires a relator to show that the defendant "conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States").

"[A] plaintiff asserting a claim under § 3729(a)(3) must show that the conspirators agreed to make use of the false record or statement to achieve this end." Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 665 (2008). Here, Defendants assert that the record contains no evidence from which a reasonable jury could conclude that Defendants conspired to violate the FCA, either between themselves or with another party, and Relator provides no evidence to rebut that assertion. Accordingly, the court GRANTS summary judgment to Defendants on Count III.

V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [#122] is GRANTED.

IT IS SO ORDERED.

Date: February 24, 2020                                      /s/ Indira Talwani
                                                            United States District Judge